[Crim. No. 9051. Fourth Dist., Div. Two. Jan. 18, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT WILLIAM BATTIN, Defendant and Appellant.

## COUNSEL

Roger S. Hanson for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McDANIEL, J.**—The defendant was charged by indictment with theft (Pen. Code, §§ 484-487), misuse of public funds (Pen. Code, § 424, subd. 2), and presentation of fraudulent claims to the county (Pen. Code, § 72). Trial was by jury. The jury returned verdicts of guilty on the misuse of public funds count, not guilty on the fraudulent claims count, and was hung on the theft count. The court later dismissed the theft count pursuant to the People's motion. Imposition of sentence was suspended, and defendant was given three years' informal probation on the condition that he serve six months in the county jail and pay a $3,500 fine plus penalty assessments. The court then suspended five of the six months of time to be served. Execution of the one month term was stayed pending this appeal.

Before trial, defendant filed two motions to dismiss. One was pursuant to Penal Code section 995. The other motion was based on supposed constitutional infirmities of the statute involved. Both motions were denied by the trial court; petitions for writs of prohibition on both these motions were denied by this court and the California Supreme Court. Otherwise, defendant filed a motion to dismiss based on alleged discriminatory prosecution, conflict of interest, and estoppel, together with an affidavit to disqualify the trial judge. These were also denied. After trial, defendant filed a motion for a new trial; this too was denied. Defendant now comes before us seeking reversal of his conviction on many grounds.

## FACTS

Defendant Robert Battin was elected Supervisor of the First District of Orange County in 1968, and was reelected to the same post in 1972. Early in 1974, while serving as supervisor, he decided to seek the Democratic Party's nomination for Lieutenant Governor of California.

During the months up to the time of the primary (February to June 1974), the defendant spent approximately 15-20 hours per week at his supervisorial office. He spent most of his remaining time at his Santa Ana law office. Because of his incumbency as a county supervisor, the county supplied defendant with four rooms of office space, a Xerox machine, regular typewriters, and a MAG card electric automatic typewriter, all to be used for his work as county supervisor. He was also given a staff of county-paid workers. One of the staffers was Attorney Ted Moraitis who served as manager of the supervisorial office. Moraitis testified at trial that he had the job of "co-ordinating office activities and carrying out instructions . . . received from Mr. Battin . . ."

After he decided to seek the nomination for Lieutenant Governor of California, defendant instructed Moraitis to have members of the supervisorial staff work on the campaign. Thereafter, from time to time throughout the months leading up to the June primary, the defendant would check on the staff's campaign activities or would question Moraitis about their progress. When asked, Moraitis would inform the defendant that the staff was performing campaign work during county working hours (approximately 8 a.m. to 5 p.m.). Just before the primary, the defendant informed the staff that the campaign was to take "priority." Throughout the campaign, the defendant paid no other people to work for his nomination, although he did receive some volunteer help from his girlfriend and her friends.

Defendant's hiring practices reflected his interest in utilizing the staff for campaign work. When being interviewed by defendant and his assistant for her position as an executive secretary, Julie Helling Grimes was asked if she had prior campaign experience. She was also asked what her party affiliation was. Dan Ryan was informed, before being hired as a part-time worker, that Battin was running for a Democratic Party nomination and that if he (Ryan) would register as a Democrat, he would stand a better chance of getting a job. Ron Dosh, also on the staff, worked additional hours on the campaign because "if you didn't, you

wouldn't have a job very long." Staff secretary, Janet Turner was hired after she brought Moraitis proof that she was registered as a Democrat. She was also asked, before being hired, if she objected to doing campaign work. Dawn Papp, who was hired as Mr. Battin's secretary, was told that he was running for Lieutenant Governor and that she "was expected to work on the campaign as part of her job."

During the period February through June 1974, the members of the supervisorial staff indicated performed the following to help secure defendant's nomination. Julie Grimes addressed envelopes to members of the central committee, addressed and stuffed newsletters announcing the defendant's candidacy and other political brochures, worked on lists of polling judges, typed out and sent out press releases concerning the defendant's candidacy, made trips to printers' shops to pick up various political material, checked the defendant's campaign statements, picked up flowers, pins and name tags for defendant's March fund-raiser, made numerous 'phone calls to see if invitees planned to attend the fund-raiser, and wrote to the clerk of each county in California to obtain lists of polling judges. *All* these activities were performed during county business hours.

Steve Knobloch telephoned the clerk of each California county to obtain membership lists of the Democratic Central Committee. He later made repeat calls to some county clerks. He also contacted local television stations and inquired about commercial time for the defendant.

Dan Ryan's primary duty was to maintain an index card file that contained the names of defendant's constituents, as well as people outside the district and members of various organizations (i.e., Cal. Trial Lawyers' Assn., Sierra Club). In April and May 1974, Ryan addressed and mailed campaign material to some of these individuals during office hours. He also accompanied the defendant on afternoon campaign trips.

In May, Dawn Papp, a staff secretary, typed campaign letters authorized by the defendant, and addressed packets of political brochures. On May 14, she worked between 10 a.m. and 3 p.m. on the filming of one of defendant's campaign commercials. During the weeks of May 27 and June 3, she spent most of her time in the supervisor's office during office hours addressing envelopes for campaign materials. After the June primary, she typed and ran off on the county MAG

typewriter some 150-200 "thank you" notes to the defendant's campaign supporters, at the defendant's direction.

Janet Turner testified at trial that she spent between 60 and 70 percent of her office time on the campaign. Among her duties was copying off a campaign essay written by the defendant. On one occasion, the defendant himself told Turner to make 50 copies of the essay on the county equipment.

Patti Short, a staff secretary, typed campaign letters and labels for political literature between February and June. She also sent out "thank you" notes to the defendant's financial contributors.

Ted Moraitis obtained voter lists from the county recorder, researched campaign matters at the defendant's request, arranged a "coffee klatch" for defendant's campaign, drafted, ordered and picked up the invitations to the defendant's fund-raiser, solicited campaign contributions and worked on TV ads for the defendant. These activities were performed at various times throughout the day and evening. However, despite all these efforts by the defendant's staff, during regular working hours, it was uncontested at trial that the defendant's supervisorial work was accomplished during the February through June period.

The atmosphere at the supervisor's office during this period was described at trial by Janet Turner: "There was a lot of secrecy in our office, hiding things from the other offices [that shared space on the defendant's floor], the campaign material being there, us working on county time doing mainly campaign work."

The county Xerox machine was located in an area common to other tenants of the building. Witness Turner described the procedures for Xeroxing off the defendant's campaign material: "When we were copying on the Xerox machine things that pertained to the campaign, we didn't leave the machine to go back to our desk or anything. We didn't want the other offices to see that material in the Xerox machine . . . I was told not to let any of the others see what I was doing."[1] Finally, the campaign material which was stored in the supervisorial office was moved to the defendant's law office at his direction because "he didn't need the Grand Jury snooping around."

---

[1]This atmosphere of secrecy caused Turner to leave the supervisor's office after only two months service there.

In the midst of all this activity, on May 8, 1974, Moraitis read a newspaper article stating that the use of county-paid staff for campaign work could be illegal. He discussed this with defendant, and they decided to remove all members of the supervisor's staff, except Moraitis and Dawn Papp, from the county payroll for the period May 13-28. For those two weeks, they were to be paid from the defendant's personal funds. Papp and Moraitis were kept on the county payroll because Moraitis felt that both were doing "substantially" county work (versus campaign work), yet both continued to perform campaign activities. Even after the remaining staff members returned to the county payroll after May 28, the defendant instructed them, as already noted, to give the campaign effort "priority." This effort continued until "thank you" letters were sent to the defendant's supporters after the June 4 primary. Those letters announced that the defendant would run for state senator from the 37th Senate District.

In July 1974, Dawn Papp left the supervisor's office and began working for Attorney William Dougherty. At the time she was hired by Dougherty, Papp mentioned "something about working on defendant's campaign" to Dougherty. He later testified that he was unaware, at the time, that the use of a publically financed staff in an election campaign was illegal. However, a year after Papp was hired, a number of Orange County officials were indicted for illegal campaign activities, including the use of county staff personnel on their campaigns. The publicity concerning these indictments reached Dougherty, and, in his words, "made me think that campaign activity by staffers was a crime, and frankly, I hadn't thought about that before."[2] Dougherty then encouraged Papp to make available to the district attorney's office the information about defendant's campaign activities. Papp's revelations led to an investigation of defendant and culminated in this conviction.

## DEFENDANT'S CONTENTIONS

Defendant presents us with numerous grounds upon which he urges that his conviction be overturned. To accommodate discussion of these,

---

[2]At the pretrial motion hearing, Dougherty testified that two events caused him to take action regarding defendant's office operations: ". . . the general tenor, and then the business about Hinshaw and all those other people [being indicted for illegal campaign activities] brought it to my attention . . . Then there was the furor about the transfer of the 22 investigators."

It is important to note that the reason Dougherty delayed in reporting the activity to the district attorney was simply that he was unaware that such activity was illegal until he learned that other officials were indicted for similar acts.

we have roughly categorized defendant's grounds into six headings: (1) challenge to the application of Penal Code section 424, subdivision 2; (2) the constitutionality of Penal Code section 424, subdivision 2; (3) failures in proof and errors in jury instructions; (4) various procedural grounds; (5) claims of discriminatory prosecution; and (6) conflict of interest.

## 1. *Challenge to the Application of Penal Code Section 424, Subdivision 2*

At the time of his conviction,[3] Penal Code section 424, subdivision 2 provided in pertinent part: "Each officer of . . . any county . . . and every other person charged with the receipt, safekeeping, transfer, or disbursement of public monies, who . . . [¶] 2. . . . makes any profit out of, or uses the same for any purpose not authorized by law; . . . [i]s punishable by imprisonment in the state prison for not less than one nor more than 10 years, and is disqualified from holding any office in this state."

■ Initially, we must decide whether the staff's campaign activities constitute a misuse of public funds by the defendant and whether the type of evidence which must be presented to establish a violation of this section was presented to the trial court.

### (a) *Activities constituted a misuse of public funds*

Turning first to whether the staff's activities constituted a misuse of public funds, we must first decide for what purpose staff salaries for February through June were paid. If county funds were paid out solely for county work, we must conclude that there was no misuse of funds. On the other hand, if staff members were being compensated with county funds for both county *and* campaign work, we must then determine whether the law authorizes the use of public moneys for campaigning.

In support of his contention that county salaries for February through June were paid out solely for county work, defendant relies on an opinion by the county counsel and certain testimony at trial. The August 28, 1975, opinion of County Counsel Adrian Kuyper was issued in response to defendant's inquiry asking "whether or not there is any minimum number of hours a staff member . . . must work in order to be entitled to compensation." Answering in the negative, Kuyper stated that

---

[3]Penal Code section 424, subdivision 2, was amended in 1977 to substitute a new determinate sentence for the former indeterminate one.

the Orange County personnel and salary resolution, which governs supervisorial staffs, exempts them from the general requirement that county employees work 40 hours per week and allows to the supervisor discretion in prescribing work hours for his staff. In concurring with this opinion, Michael Raith, chief of claims and disbursing for Orange County in 1974, opined that supervisorial staffers could take an afternoon off and thereby work less than 40 hours per week yet be paid for 40 hours.[4] However, Raith also stated, while it was acceptable for staff members to have time off that it was not permissible to require them to perform personal favors for their supervisors on county time even if their official duties had been completed.

It is clear from the record that the defendant's employees were being paid, in part, for their campaign work, despite the fact that defendant was empowered to give them occasional time off. Staff time sheets for the period February through June of 1974 credited fulltime staffers, such as Ted Moraitis and Julie Helling Grimes, for 80 hours work for each two-week pay period. No accounting was made on the time sheets for the fact that part of these 80 hours was devoted to campaign work. Staff salaries were paid on the assumption that the figures appearing on the sheets represented the number of hours of county work.[5] The same was true of part-time members of defendant's staff. Because of defendant's failure to request that the staff be paid only for those hours actually devoted to county work, the evidence shows that at least part of their pay for February through June was for work performed on behalf of defendant's campaign.

(b) *Defendant's use of public funds for his campaign*

We must now determine if it was, indeed, *defendant* who utilized county salaries to advance his campaign. The personnel and salary resolution provided that "the head of [the] department [here, the defendant] shall file a written certificate with the Auditor-Controller to the effect that each of his employees, during said pay period, has performed services *for the County* as required by law.[6] If there is any

---

[4]County Counsel Kuyper testified at trial that, in his opinion, staffers had to work at least a "reasonable" number of hours to be paid for 40-hour weeks.

[5]Mr. Raith, who was in charge of the office that made out the employees' checks, so testified at trial.

[6]At trial, Raith testified that the "services required by law" were *county* services.

exception, the Department Head shall so state in his certificate." (Italics added.) Accordingly, defendant approved the staff time sheets for February through June by signing his name[7] to the following certification which appeared on each sheet: "I hereby certify that each of the employees listed . . . has performed the services as set forth thereon, and I hereby authorize and approve payment of salary to each of these employees as provided by the Personnel and Salary Resolution."

At trial, Raith testified that defendant's certification was "a disbursement of [county] funds" because, without it, staffers would not have been paid. Upon receipt of time sheets bearing defendant's certification, Raith's office routinely issued staff pay checks.

Defendant contends, however, that he did not "disburse" public moneys within the meaning of section 424, subdivision 2, because he did not have actual custody of the moneys paid to his staff. To support his argument, defendant relies on the legislative history of the section and on *People* v. *Knott,* 15 Cal.2d 628 [104 P.2d 33, 128 A.L.R. 1367], and *People* v. *Dillon,* 199 Cal. 1 [248 P. 230]. The same contention, and the same authorities were utilized by the defendant in *People* v. *Qui Mei Lee,* 48 Cal.App.3d 516 [122 Cal.Rptr. 43]. The court therein, however, rejected the defendant's contention, holding that *Knott* and *Dillon* did not limit section 424, subdivision 2's, applicability solely to officers having actual custody of public funds. In fact, the court in *Qui Mei Lee* stated that defendant's approval of invoices for medical and lab services, which were then automatically paid by the county auditor, enabled defendant to control the disbursement of public moneys within the meaning of the statute. Similarly, in *People* v. *Sperl,* 54 Cal.App.3d 640 [126 Cal.Rptr. 907], the defendant had authorized his secretary to credit county employees with hours spent on noncounty activities. The Court of Appeal upheld the defendant's conviction under section 424, subdivision 3, stating: ". . . the . . . time records 'related' to the disbursement of public moneys. These records were used as the basis for the disbursement of county funds to the various employees . . . ." (*Id.* at p. 656.)[8]

---

[7]For a few pay periods during February through June, defendant was out of town and therefore unable to approve the time sheets, so Moraitis affixed defendant's signature stamp to the sheets. The time sheets for the remaining pay periods were approved personally by the defendant.

[8]In addition, the court in the cited case found meritless defendant's contention that he did not violate section 424 because the county controller, not he, issued the paychecks. (*Id.* at pp. 658-659.)

As in . *Qui Mei Lee* and *Sperl,* defendant here authorized the expenditure of county moneys for noncounty activities.[9] Defendant's certification on the staff time sheets was, indeed, a "disbursement" of public moneys within the meaning of section 424.

(c) *Diversion of services constitutes misuse of public funds*

Finally, defendant contends that he cannot be convicted of misuse of public moneys because only services and not public moneys were involved. A similar contention was advanced in *Sperl,* wherein the defendant ordered his deputies to use the county vehicle on county time to transport an official and his family on personal errands. The court upheld the defendant's conviction based on section 424, subdivision 1 (misappropriation of public moneys), stating that: "defendant as a county officer misappropriated county funds (salaries) for personnel performing activities which were clearly outside the scope of their proper duties. Under such circumstances the trial court properly found that the transportation of Hayes, his family and staff resulted in a substantial monetary loss to the county by reason of the payment of the deputies' salaries while performing these improper tasks and that this constituted a misappropriation of public moneys within section 424, subdivision 1." (*People* v. *Sperl, supra,* 54 Cal.App.3d 640, 658.)

The holding in *Sperl* makes clear the fact that salaries are "public moneys" within the meaning of section 424, and that one who authorizes the illegal payment of salaries has violated that section. Hence, defendant's argument is without merit. Stated otherwise, as a consequence of the holding in *Sperl,* it is our view that defendant's diversion of county employees to the performance of tasks in aid of the defendant's personal political campaign amounted to a use of public moneys for a "purpose not authorized by law."

2. *The Constitutionality of Penal Code Section 424, Subdivision 2*

Having established that defendant, an official charged with the disbursement of county funds, misused those funds in violation of section 424, subdivision 2, we now address the contention that this section suffers from constitutional infirmities.

(a) *Penal Code section 424, subdivision 2, is an ex post facto law*

---

[9]We are unpersuaded by defendant's contention that it was Ted Moraitis and not himself who wished to use the staff on the campaign, and that defendant was ignorant of such use. The evidence presented at trial simply does not substantiate defendant's version of the facts on this point.

■ Defendant first claims that the application of section 424, subdivision 2, to the facts here violates the constitutional prohibition against ex post facto laws in that it later makes criminal certain conduct which was innocent when done. To support the theory that using publically funded staff members on campaigns is permissible, defendant refers to two opinions of County Counsel Adrian Kuyper, and to what defendant calls the "widespread and sanctioned" use of public supported staffers for campaigning. The first Kuyper opinion simply stated that the defendant's staff did not have to work a certain number of hours to be entitled to be paid.[10] Despite defendant's wish to the contrary, this opinion cannot, by any stretch of the imagination, be construed to authorize the use of county paid staff in a campaign. The second opinion stated that the county should pay for newsletters sent *to the supervisors' constitutients* when such newsletters *pertained to matters of county interest.* As mentioned before, defendant's staff used county time to mail out newsletters in February that announced defendant's desire to run for Lieutenant Governor of California. The April newsletters that were sent out contained remittance envelopes for those who wished to mail in campaign contributions. Both sets of newsletters were mailed to constituents and nonconstituents alike. We fail to see how the county counsel's opinion can be viewed as sanctioning defendant's behavior in mailing newsletters concerning his campaign to nonconstituents.

Otherwise, defendant refers to numerous newspaper articles and congressional committee reports which reveal that many federal officials use their staffs for campaign work. While we note that defendant speaks only of *federal* officials, we observe that officials in this state have been indicted and/or convicted for precisely the kind of activities engaged in by defendant. (See *People* v. *Holtzendorff,* 177 Cal.App.2d 788 [2 Cal.Rptr. 676];[11] *People* v. *Sperl, supra,* 54 Cal.App.3d 640.[12]) Activities

---

[10]Defendant also contends that his conviction was unfair because he relied on this opinion in having the staff devote county hours to his campaign. We find it odd that defendant claims such reliance when the activities in question occurred between February and June 1974, and the opinion was issued in August 1975, over a year later.

[11]In *Holtzendorff,* the defendant, an official of the Los Angeles Housing Authority, used 19 authority staffers and office equipment rented at the authority's expense to assist in a political campaign. The counts against defendant alleging violations of section 424 were dismissed because the court found that the authority was a public corporation and not a division of state, county or city government within the meaning of section 424. However, the counts alleging violations of Penal Code section 504 (embezzlement of public moneys) were allowed to stand. The staff activities in *Holtzendorff* were strikingly similar to those in this case. (See pp. 803-804.)

[12]In *Sperl,* employees of the Los Angeles County Marshal's office used county time to lobby for favorable legislation in Sacramento. They also used county time to make

that are analogous to those here have also been condemned. (See *People v. Nathanson,* 134 Cal.App.2d 43 [284 P.2d 975]; [13] *People v. Harby,* 51 Cal.App.2d 759 [125 P.2d 874].[14]) In *Mines v. Del Valle,* 201 Cal. 273, 287 [257 P. 530], the Supreme Court reviewed the use of public funds to support a bond issue. The court's language therein is instructive: "To use . . . public funds to advocate the adoption of a proposition which was opposed by a large number of . . . electors would be manifestly unfair and unjust to the rights of [electors who opposed the proposition] . . . ." (*Mines v. Del Valle, supra,* 201 Cal. 273, 287, overruled on other grounds, *Stanson v. Mott,* 17 Cal.3d 206, 223 [130 Cal.Rptr. 697, 551 P.2d 1].)

Facts similar to *Mines* were present in *Stanson v. Mott, supra,* in which the California Supreme Court said: "[E]very court which has addressed the issue to date has found the use of public funds for partisan campaign purposes improper, either on the ground that such use was not explicitly authorized [citations] or on the broader ground that such expenditures are never appropriate. [Citation.] . . . [¶] Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. *A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions.* A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office [citations]; the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process . . . . [¶] [T]o date the judicial decisions have uniformly held that *the use of public funds for campaign expenses is as improper* in bond issue or other noncandidate elections *as in candidate elections.*" (*Id.* at pp. 217-218; italics added.)

In light of this recent pronouncement by our Supreme Court, as well as the other authorities cited above, we cannot agree with defendant that

---

phone calls soliciting support for then-Assemblyman Hayes' candidacy for county supervisor. Marshals also used county time to chauffeur Assemblyman Hayes and his family on private errands. The Court of Appeal upheld convictions of criminal offenses as to each of these activities.

[13]Nathanson, a city councilman, used official city stationery in his campaign for reelection. The trial court's order, setting aside the indictment, was reversed by the Court of Appeal.

[14]Harby used city-owned vehicles for unauthorized purposes. He was convicted of a violation of section 504, embezzlement of public moneys.

the use of a publically funded staff for campaign purposes is "sanctioned" by the law, written or unwritten. Section 424 has been on the books since 1872 and has been utilized in the past against officials who used public funds for political campaigns. In the face of all this, defendant has not convinced us that the application of section 424 to his activities was unique or violated the constitutional prohibition against ex post facto laws.

(b) *Penal Code section 424, subdivision 2, is vague*

■ Next defendant contends that section 424, subdivision 2, is unconstitutional because, as a result of its vague phrasing, it fails to give the individual fair notice of the behavior it proscribes. Defendant specifically refers to the language "for any purpose not authorized by law" as being vague. He further contends that he cannot be punished for using the staff on his campaign because such activity is not per se proscribed anywhere in the Penal Code. This is so according to defendant because there exists nowhere in the statutes a list of powers which supervisors are authorized by law to exercise. Finally, he contends that the prohibitions expressed in section 424, subdivision 2, inhibit First Amendment rights; therefore, the language of the section should be more specific than it is.

■ In answer to defendant's first contention that section 424, subdivision 2, is vague, we begin with the general principle of law that a penal statute is presumptively valid and " ' "[r]easonable certainty is all that is required. A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language." It will be upheld if its terms may be made reasonably certain by reference to other definable sources.' [Citations.]" (*People* v. *Superior Court (Hartway)*, 19 Cal.3d 338, 345 [138 Cal.Rptr. 66, 562 P.2d 1315].)

■ Section 424, subdivision 2, is clear in its language. It prohibits the use of public moneys for any purpose which has not, to that time, been explicitly authorized by state statutes or local ordinance. The fact that governmental officials are permitted to expend public funds only for those purposes explicitly approved was reiterated by the California Supreme Court in *Stanson* v. *Mott, supra,* 17 Cal.3d 206: "We start with the general principle that expenditures by an administrative official are proper only insofar as they are authorized, explicitly or implicitly, by

legislative enactment. Contrary to defendant's contention below, such executive officials are not free to spend public funds for any 'public purpose' they may choose, but must utilize appropriated funds in accordance with the legislatively designated purpose." (*Id.* at p. 213.)

An examination of California law, as it relates to the power of county supervisors, reveals constant reference to the term "not authorized by law." In *Merriam* v. *Board of Supervisors*, 72 Cal. 517 [14 P. 137], the California Supreme Court said, of supervisors, "[i]f they willfully appropriate moneys for a purpose *not authorized by positive law*, they are liable civilly and criminally." (*Id.* at p. 519; italics added.)

Government Code section 25042 provides, in part: "Any supervisor who . . . (d) wilfully, fraudulently, or corruptly attempts to perform an act as supervisor which is *unauthorized by law* . . . forfeits to the county five hundred dollars ($500) for every such act . . ." (Italics added.)

■ The powers of supervisors are enumerated in the Government Code at section 25200 et seq.[15] Those powers are limited to those explicitly set forth in the Government Code and all incidental powers necessary to carry out the enumerated ones. (*County of Modoc* v. *Spencer*, 103 Cal. 498, 501 [37 P. 483].) The reason for this limitation on supervisors' powers is simple; the position of supervisor was legislatively created and the authority for any act a supervisor performs must therefore be grounded on statute. (*County of Modoc* v. *Spencer, supra*, 103 Cal. 498, 499; 51 Ops.Cal.Atty.Gen. 190, 193; 42 Ops.Cal.Atty.Gen. 25, 26; 29 Ops.Cal.Atty.Gen. 183-184; 17 Ops.Cal.Atty.Gen. 161, 162.)

Nowhere in Government Code section 25200 et seq. is there authority for using public moneys on political campaigns. Section 424, subdivision 2, like other statutes governing the powers of supervisors, works in reverse of most penal statutes that apply to ordinary citizens. Rather than prohibiting specifically enumerated behavior, it prohibits any behavior which has not been previously approved by statute or ordinance.[16]

---

[15]All the powers in section 25200 et seq. are well defined except that power provided for in section 25207 which states that the supervisors may "perform all other acts and things required by law not enumerated in this part, or which are necessary to the full discharge of the duties of the legislative authority of the county government."

[16]In cases involving violations of Penal Code section 424, subdivision 2, officials were prosecuted for committing acts which were not specifically condemned by other laws, but which were simply not authorized by law. (See *People* v. *Dillon, supra*, 199 Cal. 1; *People* v. *Wilson*, 117 Cal. 242 [49 P. 135]; *City of Los Angeles* v. *City Bank*, 100 Cal. 18 [34 P. 510]; *People* v. *Schoeller*, 96 Cal.App.2d 55 [214 P.2d 572].) As stated in *Dillon* in 1926,

In *People* v. *Sperl, supra,* a similar "void for vagueness" attack was made on section 424, subdivision 1, which contains the "without authority of law" language. In response to defendant's contention that the statute did not give him fair warning of what conduct was proscribed, the Court of Appeal stated: "It was reasonable for the trial court to have found that defendant knew his conduct was forbidden by the statute. Evidence . . . showed defendant personally, and with the aid of his colleagues, *removed evidence of these transactions* from official county records *to prevent such conduct from coming to light.* Neither the statute nor the court's interpretation of it are unconstitutionally vague." (54 Cal.App.3d 640, 661; italics added.)

 As in *Sperl,* the defendant here attempted to secrete the evidence of his staff's activities. From this we can imply, as did the court in *Sperl* that defendant was aware of the illegality of his course of conduct. Beyond this, the knowledge he gained on May 8 via the newspaper story gave him sufficient notice. Yet, the activities continued. In light of this, and of the fact that many statutes governing the powers of supervisors carry this "without authority of law" language, we cannot agree with defendant that section 424, subdivision 2 is vague.

(c) *To affect First Amendment rights, Penal Code section 424, subdivision 2, must be more specific*

 Defendant also contends that where a statute affects First Amendment rights, its language must be specific. Defendant sees section 424, subdivision 2, as restricting the ability of county workers to campaign.[17] Section 424, subdivision 2, however, restricts campaigning only *during county work hours.* After 5 p.m., and on weekends, county workers, like any other citizen, are free to campaign as much as their own time will permit. To suggest that the county must allow its workers to utilize tax-funded time for campaigning is a distortion of the law.

"[i]t has continuously been the policy of the law that the custodians of public moneys . . . should hold and keep them inviolate and use or disburse them only in strict compliance with the law." (*Id.* at p. 12.)

[17]Defendant contends that because his staff could have been given time off, the work they performed on the campaign was on their own time. Again, we state that defendant's ability to allow the staff to take occasional time off is a far cry from a systematic plan to utilize, even coerce, the staff into working for his nomination. This is not a case in which an employee, with an afternoon off, is asked if he or she would like to help defendant with his campaign. This is a deliberate scheme to convert county workers into part-time campaigners.

(d) *Penal Code section 424, subdivision 2, is overbroad.*

Defendant advances the argument that section 424, subdivision 2, is void because it is overbroad. Generally, statutes which are overbroad are those "which prohibit constitutionally protected conduct." (*Bowland* v. *Municipal Court,* 18 Cal.3d 479, 493 [134 Cal.Rptr. 630, 556 P.2d 1081].) Although defendant fails to specify what constitutionally protected behavior section 424, subdivision 2, restricts, we surmise that he refers to the restriction it allegedly places on county workers' ability to campaign. We have already considered and discounted this contention above. Further elaboration of this point is unnecessary.

(e) *Penal Code section 424, subdivision 2, violates the separation of powers doctrine*

■ Defendant alleges that the separation of powers doctrine precludes using section 424, subdivision 2, to punish his misuse of public moneys because such use robs the Legislature of its ability to regulate the executive branch. For this proposition defendant cites us to *Public Citizen, Inc.* v. *Simon,* 539 F.2d 211. Therein, the District of Columbia Court of Appeal recited the rule that federal-taxpayer challenges to executive spending may be brought only when the taxpayer demonstrates that the expenditure "exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power . . . ." (*Id.* at p. 214.) The court explained that this restriction was necessary to prevent exposing "to taxpayer challenge every appropriation act whose administration requires the outlay of money, and . . . thrust[ing] the Judiciary into conflict with the other branches of government without the direct, particularized harm that lends legitimacy and urgency to the call on the courts to act." (*Id.* at pp. 213-214.) Thus, court review of federal executive spending absent a specific limitation on the spending power to serve as a guide must be prevented. In contrast to the situation in *Simon,* we have here a specific penal prohibition against spending county funds for any purpose not already authorized by law. We are not being asked to decide, without the aid of guidelines, whether or not defendant's expenditure was illegal. The litmus paper of legitimacy is the test to be applied and can be easily administered by the courts. Had the Legislature not intended thus to restrict the spending of county funds, it would not have enacted section 424, subdivision 2, and other similar provisions, and would not have empowered the courts to impose sanctions on those who violated those provisions.

### 3. *Failures in Proof and Errors in Jury Instructions*

Defendant claims that a violation of section 424, subdivision 2, was not demonstrated at trial because the specific dollar amount of loss to the county, by virtue of defendant's activities, was not proven, and that the jury could not have found that defendant's behavior constituted a specific intent crime because specific intent instructions were not given at trial.

### (a) *Proof of violation of Penal Code section 424, subdivision 2*

■ As to this ground for reversal, defendant cites no authority to support his claim that a specific dollar amount loss must be demonstrated in Penal Code section 424, subdivision 2, cases. We can locate no statutory or case law which requires it. Accordingly, we must conclude that defendant's point is without merit.

Defendant argues that his conviction should be overturned (1) because he relied in good faith on the county personnel and salary resolution, and (2) because his conviction was not supported by substantial evidence.

As to the first point, defendant relies on *Stanson v. Mott, supra,* 17 Cal.3d 206, to argue that his good faith reliance on the salary resolution creates a valid defense to the crime for which he was convicted. However, *Stanson* was a *civil* suit to recover public funds brought by a taxpayer against an official who had allegedly misused those funds. The plaintiff therein claimed that an official who misused public funds was *strictly liable* to the taxpayer for the money lost. Rejecting this view, the court declared that such an official may be personally liable, in tort, only if he failed to exercise due care or to demonstrate good faith in expending the funds. In citing *Stanson,* defendant here attempts to relate the civil law to his criminal conviction. As in the case of oranges and apples, the two simply cannot be treated analogously.[18]

■ Next, defendant contends that his conviction is not supported by substantial evidence. The rule governing our review of the evidence was set forth in *People v. Mosher,* 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659]: ". . . this court must view the evidence in a light most favorable to respondent and presume in support of the judgment the

[18]Beyond this, defendant has failed to persuade us that "good faith" entered at all into his decision to order the staff to work on his campaign.

existence of every fact the trier could reasonably deduce from the evidence. [Citation.] . . . If the circumstances reasonably justify the trial court's findings, an appellate court cannot reverse merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.]"

We have carefully reviewed the extensive record in this case, especially noting defendant's reference to the facts which he believes exonerate him. Our review reveals a deliberate and planned scheme by which defendant utilized, for campaign purposes, any spare moment of his staff's county time. We also note an extensive use of county office equipment, as well as use of defendant's position, as a county official, to obtain advantageous information that may not have been so readily available to his opponent. We further note that in May, defendant became acutely aware of the illegal nature of his activities, but, rather than stopping them at that point, he continued such activities with greater intensity and secrecy. In his attempt to contradict all this evidence, defendant lays out an elaborate accounting of the total amount of campaign literature sent out by his county-paid staff (5,140 pieces). Even if we were to accept this figure as accurate, it remains a fact that the county staff engaged in many types of campaign activities, not just in the disbursing of political literature. In addition, we note that section 424, subdivision 2, is not a quantitative statute; its proscription is not limited to the misuse of public funds in a particular monetary amount. Rather it proscribes *any* misuse, no matter how small. It is apparent, from the record, that the People have presented substantial evidence of defendant's crime.

(b) *Errors in jury instructions*

Next, defendant advances several theories to prove that violations of Penal Code section 424, subdivision 2, constitute "specific intent" crimes, and that because the jury here was not given "specific intent" instructions, he could not have been convicted of violating that section.

■■ ■■■■ Defendant states that the jury was given a "strict liability"[19] crime instruction. In fact, however, the trial court gave the

---

[19]Defense counsel seems to lose sight of the basic distinctions between "specific intent," "general intent," and "strict liability" crimes. "Specific intent" crimes are those wherein the defendant is aware of and desires the consequences of his actions. "General intent" occurs when the act is knowingly or willfully done. The defendant is presumed to have intended all he did and all consequences thereof. "Strict liability" crimes are those which, unlike "general intent" and "specific intent," do not require the union of criminal

standard "general intent" instruction.[20] It thus remains for us to determine if a violation of section 424, subdivision 2, constitutes a "general intent" crime or a "specific intent" crime.

■ Defendant argues that a violation of section 424 subdivision 2, constitutes a specific intent crime because: (1) the section deals with larceny or embezzlement, both of which are specific intent crimes; (2) section 424 contains no clause stating that specific intent is not required to constitute a violation; and (3) defendant acted in good faith and therefore should have had the benefit of a "specific intent" instruction.

Contrary to defendant's first contention, it is clear that section 424 is neither an embezzlement statute, nor does it require proof of specific intent. (*People* v. *Holtzendorff, supra,* 177 Cal.App.2d 788, 795-796;[21] *People* v. *Dillon, supra,* 199 Cal. 1, 11.[22])

As to his second assertion, it is true that section 424 contains no clause which provides that violations of it are "general intent" crimes. However, our review of the list of Penal Code sections with which defendant

acts and criminal intent. (17 Cal.Jur.3d, Criminal Law, §§ 59, 60, 64.)

Defendant cites *Morissette* v. *United States,* 342 U.S. 246 [96 L.Ed.2d 288, 72 S.Ct. 240]. *Morissette* merely states that the element of intent was not eliminated by Congress from the crime of knowing conversion of government property. It did not hold, as defendant claims, that any form of larceny (including misuse of public funds) must be declared a "specific intent" crime. Unquestionably, criminal intent is an element of a section 424, subdivision 2, violation and such intent is general. The jury received a proper "general intent" instruction.

[20]Defendant offered at trial the following jury instruction: ". . . that the commission of the crime of the violation of 424.2 [*sic*] of the Penal Code alleged in Count II of the indictment requires specific intent. As charged you must find Mr. Battin not guilty of that offense unless it is proved beyond a reasonable doubt that he had the specific intent to use county funds for the unauthorized purpose of paying persons for working on his campaign."

The trial court refused this instruction, and used the following: "[T]here must exist a union or joint operation of act or conduct and general criminal intent. To constitute general criminal intent it is not necessary that there should exist an intent to violate the law. Where a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful."

This instruction is taken verbatim from CALJIC No. 3.30 (1975 revision).

[21]The court herein took note of the fact that several courts had labeled section 424, subdivision 2, an embezzlement statute. It is noted, as well, that the word "embezzlement" appeared in section 424's title. Despite this, the court found that section 424 and the embezzlement of public funds statute, section 504 were distinguishable.

[22]Defendant attempts to utilize the doctrine of *ejusdem generis* to argue that section 424, subdivision 2, is a specific intent crime. However, we find the mandate of *Holtzendorff* and *Dillon* to the contrary to be quite clear.

supplied us reveals that many general intent crimes are not so designated on their face (by means of such a phrase), but, rather, have been labeled "general intent" crimes by court decisions. Therefore, we fail to see why a violation of section 424, subdivision 2, cannot, like violations of other sections, be designated a "general intent" crime by court decision. In practice it has been.

Finally, defendant relies on the *Dillon* case to argue that because he acted in good faith, he was entitled to a "specific intent" instruction. In *Dillon*, the California Supreme Court made mention of the argument, also advanced by defendant here, that if public moneys were disbursed illegally, yet in good faith, the official who disbursed them should not be punished. However, the court dismissed the argument, stating that it had no application to the facts then before it. A "specific intent" instruction was not called for here.

(c) *Consequences of conviction*

 Defendant next claims that he was convicted of a misdemeanor and that his acts did not involve moral turpitude. He contends, therefore, that he should not be disqualified from holding public office in the future.

 In support of his first point, defendant cites *People* v. *Simon,* 227 Cal.App.2d 849 [39 Cal.Rptr. 138]. Therein, the defendant was convicted of violating Penal Code section 476a, for which a term in state prison *or* county jail could be imposed. The court relied on Penal Code section 17, subdivision (b), in declaring the defendant's crime to be a misdemeanor because that section provides "(b) When a crime is punishable, in the discretion of the court, by imprisonment in the state prison or by fine *or* imprisonment in the county jail, it is a misdemeanor . . . ." (Italics added.) As the Attorney General correctly points out, however, section 424, subdivision 2, does not provide for alternative sentences as does section 476a, but stipulates that time shall be served *only* in the state penitentiary. Defendant's crime, therefore, cannot be deemed a misdemeanor under Penal Code section 17, subdivision (b) or *Simon.* Rather, it falls within the provisions of Penal Code section 17, subdivision (a), which defines a crime punishable by state imprisonment as a felony.[23]

---

[23]In his reply brief defendant cites us to *People* v. *Trimble,* 18 Cal.App.2d 350, 351 [63 P.2d 1173], which held that a crime is classified as a felony or misdemeanor according to the sentence imposed. If a misdemeanor sentence is imposed (time in county jail) the offense will be deemed a misdemeanor. However, defendant forgets that imposition of

Defendant also urges us to "rule" that the activities for which he was convicted did not involve moral turpitude, thus, he should not be disqualified from seeking elective office. However, section 424 specifically provides that those found guilty of violating it shall be disqualified from holding public office. We are powerless to contradict the clear language of the section, and we find it unnecessary to pass upon the moral nature of defendant's acts.

## 4. *Procedural Issues*

### (a) *Withholding evidence from the grand jury*

First, defendant assigns as reversible error the fact that the district attorney failed to subpoena, for purposes of the grand jury hearing, defendant's girl friend and others who did *volunteer* work on his campaign. Defendant claims that their testimony was material and could have influenced the grand jury's decision whether or not to indict him. Herein, defendant relies on *Johnson* v. *Superior Court,* 15 Cal.3d 248 [124 Cal.Rptr. 32, 539 P.2d 792]. In *Johnson,* defendant's testimony at his preliminary hearing persuaded the magistrate to drop the charges against him; yet, when the district attorney sought an indictment on the same charges, he failed to disclose to the grand jury the content of defendant's statements. With reference to such a practice, the Supreme Court held that "[w]hen a district attorney seeking an indictment is aware of evidence *reasonably tending to negate guilt,* he is obligated . . . to inform the grand jury of its nature and existence." (*Id.* at p. 251; italics added.)

First, the mandate in *Johnson* applies only to grand jury proceedings that take place after September 19, 1975. (*People* v. *McAlister,* 54 Cal.App.3d 918, 926 [126 Cal.Rptr. 881].) Because the grand jury here met in early August of 1975 and returned an indictment against defendant on the 13th of that month, *Johnson* is chronologically inapplicable. However, even if *Johnson* were to apply, we still cannot agree with defendant that error was committed in not utilizing the testimony of his volunteer campaign force. Defendant himself was allowed to testify before the grand jury concerning the number of volunteers who worked for him and the type and amount of work they

---

sentence was *suspended* here. When imposition of sentence is suspended, and a period of "local time" serves as a condition of probation, as it did here, such "local time" confinement cannot be considered as an imposed sentence. (*People* v. *Esparza,* 253 Cal.App.2d 362, 364-365 [61 Cal.Rptr. 167].) Therefore, the offense cannot be classified as a misdemeanor merely because local time is served as a condition of probation. (*Id.*)

performed. He even supplied the grand jury with a list of all their names. Had the grand jury wished to corroborate defendant's account from the volunteers themselves, it could have subpoenaed them. (*People* v. *McAlister, supra,* 54 Cal.App.3d 918, 927.) So long as the basic information itself was revealed to the jury, which it was by defendant's own testimony, the district attorney's duty, if any, was discharged.

Further, we question whether this evidence can be viewed as "tending to negate" defendant's guilt. Defendant might have had hundreds of volunteers who worked around the clock on his campaign and still have utilized his county-paid staff for more campaign duties. In light of the foregoing, we must reject defendant's contention that his conviction be overturned because his volunteer force did not testify before the grand jury.

(b) *Denial of discovery of certain matters*

■ Defendant claims that his conviction should be overturned because the trial court denied discovery of certain matters. According to his brief, those matters are "other files involving the named members" of the so-called warring political factions in Orange County. He alleges that discovery of these "additional files . . . could have raised a stronger inference of [discriminatory prosecution] than was possible by only obtaining files which defendant could with *particularity identify.*"[24] (Italics added.) Thus, defendant admits, and the facts demonstrate, that the trial court granted discovery on the discriminatory prosecution issue of those materials specified by the defendant, but not of those materials which defendant could not identify or specify.

In claiming that this action constitutes reversible error, defendant relies on *Murgia* v. *Municipal Court,* 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44]. However, his reliance is misplaced, for in *Murgia* the defendant specified precisely what items he wished to discover. (*Id.* at p. 305, fns. 16, 17.) Here, defendant admittedly failed to specify to the trial court what additional materials he wanted. Likewise, his brief before this court fails to clarify the nature of his request.[25]

---

[24]We note with interest that during oral argument, defendant stated his desire to de-emphasize the "warring political factions" approach to his discriminatory prosecution claim and to call to our attention the importance of the personal animosity between himself and the district attorney. In light of this, we pause to wonder if defendant's argument re discovery still has significance.

[25]Defendant also failed to include in the record on appeal a copy of his discovery motion.

In view of the foregoing uncertainty, we feel that the California Supreme Court's statement in *Hill* v. *Superior Court,* 10 Cal.3d 812, 817 [112 Cal.Rptr. 257, 518 P.2d 1353], is dispositive: " 'the [trial] court has discretion to deny discovery in the absence of a showing which *specifies the material sought* and furnishes a "plausible justification" for inspection. [Citations.]' "[26] The trial court did not commit prejudicial error in refusing to order discovery of unspecified materials.

(c) *Exclusion of certain evidence*

■ Defendant believes that prejudicial error occurred when the trial court excluded, as being irrelevant, evidence that: (1) in 1971, he returned $1,970.74 of his personal salary to the county and, in 1972, $984.26; and (2) that he spent $11,000 less than his total appropriated budget in 1973-1974.

It is well established that the trial court is vested with wide discretion in deciding whether evidence is relevant or not. (*People* v. *Warner,* 270 Cal.App.2d 900, 908 [76 Cal.Rptr. 160].) Defendant must demonstrate that that discretion has been abused. (See *San Diego Gas & Electric Co.* v. *Davey Tree Surgery Co.,* 11 Cal.App.3d 1096, 1103 [96 Cal.Rptr. 889].) As for the first piece of evidence, we fail to see how defendant's acts in 1971 and 1972 bear any relevance whatsoever to activities which occurred in 1974. The only reason we can surmise why defendant would want to introduce such evidence would be to demonstrate that he is basically a "good guy" and, therefore, could not be guilty of misusing public funds. However, past acts are inadmissible to prove good or bad character. (Evid. Code, § 1101; Witkin, Cal. Evidence, § 332.) As for the fact that defendant underspent his 1973-1974 budget, we can only comment, that even if defendant spent only one dollar of his total budget yet spent it for a purpose not authorized by law, that he would still be guilty of violating section 424, subdivision 2. We find no reversible error here.

(d) *Inconsistent verdicts*

■ Next, defendant attacks the verdicts as being: (1) in violation of the doctrine of collateral estoppel; and (2) inconsistent. He argues that his acquittal on charges of violating Penal Code section 72, presentation

---

[26]This position has been very recently reiterated by our Supreme Court in *Griffin* v. *Municipal Court* (1977) 20 Cal.3d 300 [142 Cal.Rptr. 286, 571 P.2d 997], wherein the defendants' list of items for discovery was found to be sufficiently specific.

of fraudulent claims, collaterally estops his conviction of violating section 424, subdivision 2. He relies on *Ashe* v. *Swenson,* 397 U.S. 436 [25 L.Ed.2d 469, 90 S.Ct. 1189], for support. In *Ashe,* however, the doctrine was utilized to prevent a *subsequent retrial* of a defendant on the same charges, and not to prevent his conviction on some counts and acquittal on others in the same prosecution.[27] Because defendant fails to cite us to any authority which truly supports his contention, we reject it.

As for his claim that the doctrine of inconsistent verdicts precludes defendant's conviction of section 424, subdivision 2, while being acquitted of violating Penal Code section 72, the cases which defendant cites indicate themselves the fallacy of his analysis. As stated in both *People* v. *Hickman,* 31 Cal.App.2d 4, 11 [87 P.2d 80], and *People* v. *Guerrero,* 22 Cal.2d 183, 189 [137 P.2d 21], "the test [of inconsistency] is whether or not the essential elements in the count wherein the defendant was acquitted are identical and necessary to proof of conviction on the guilty count." Further, " ' "if [such count] requires proof of a fact additional to those involved in the other an acquittal or conviction of either does not result in the defendant having been in jeopardy for the other." ' " (*People* v. *Coltrin,* 5 Cal.2d 649, 660 [55 P.2d 1161], overruled on other grounds, *People* v. *Brown,* 49 Cal.2d 577, 593 [320 P.2d 5].) Penal Code section 72 provides in pertinent part, "Every person who, with *intent to defraud,* presents for allowance or for payment to any . . . county . . . authorized to allow or pay the same if genuine, any false or fraudulent claim, bill, account, voucher, or writing, is punishable . . . ." (Italics added.) A violation of Penal Code section 72 cannot be accomplished without the requisite intent to defraud. No such intent, however, is required of a violation of section 424, subdivision 2. Therefore, a conviction under Penal Code section 424, subdivision 2, and an acquittal under Penal Code section 72 simply means that a false claim was presented, with general criminal intent, but without intent to defraud. Defendant's contention is without merit.

(e) *Delay in indictment*

Defendant states that he was prejudiced by the 14-month delay between his activities and his indictment. He claims, because of the

---

[27]In *Ashe,* defendant was accused of simultaneously robbing six individuals who were in one room at the time of the robbery. Defendant was first tried and acquitted of robbing one of the six. He was subsequently prosecuted for robbing another of the six, but the Court of Appeal declared that this later procedure had been collaterally estopped by the first.

delay, that witnesses forgot important details and two witnesses were unavailable to testify. As for his first point, defendant fails to substantiate, by reference to the record, such memory loss on the part of any witness. We, therefore, may disregard the point.

As for his second point, prejudice necessitating reversal of a conviction is demonstrated only when the witnesses "lost" were *material.* (*People* v. *Archerd,* 3 Cal.3d 615, 640 [91 Cal.Rptr. 397, 477 P.2d 421].) The witnesses defendant claims were lost because of the passage of time were two of defendant's volunteer campaigners. We have already concluded that the testimony of the volunteers was not material to defendant's guilt because no amount of volunteer work could detract from the fact that some misuse of county staff occurred. The crime was not reported to the district attorney's office until July 1975. This accounts for the delay. (See *People* v. *Bethea,* 18 Cal.App.3d 930, 939 [96 Cal.Rptr. 229].)

### (f) *Misinterpretation of jury instructions by one juror*

Defendant hopes to have his conviction reversed by offering the affidavit of one juror,[28] Gloria Godfrey, to the effect that she misunderstood the jury instruction, in that "[i]f the Court had made it clear that he [the defendant] had to have actual knowledge and to authorize the campaign activity specifically, I would have voted not guilty on all counts." We have already concluded above that the jury instructions were proper. It is settled law that jurors may impeach a verdict only by testifying as to objective facts (those detectable by the senses) and not by testifying as to their own mental processes or reasons for arriving at their verdict. (*People* v. *Hutchinson,* 71 Cal.2d 342, 350 [78 Cal.Rptr. 196, 455 P.2d 132], cert. den., 396 U.S. 994 [24 L.Ed.2d 457, 90 S.Ct. 491]; *People* v. *Stevenson,* 4 Cal.App.3d 443, 445 [84 Cal. Rptr. 349].) Juror Godfrey's affidavit attempts to do exactly that which the law disallows; therefore, defendant's contention on this point is without merit.

### (g) *Bias of certain jurors*

Finally, defendant asks us to reverse his conviction because he claims that certain members of the jury were biased against him.[29] After filing

---

[28]This affidavit was made part of defendant's motion for new trial, below, but it was ordered stricken by the trial court.

[29]This contention, like the one just discussed, is based on an affidavit by juror Gloria Godfrey.

this appeal, defendant presented us with a petition for a writ of habeas corpus based on the same allegation of jury bias. In response, we issued an alternative writ and an order of reference, and an evidentiary hearing will be conducted as to that matter.[30] We, therefore, will consider the contention noted when it is presented after the hearing ordered and not here.

Finally, we turn to the two arguments which defendant has emphasized most throughout his appeal. He contends that his conviction should be reversed because he was discriminatorily selected for prosecution and because a conflict of interest prevented the district attorney's office from properly performing its duties during the investigation and prosecution of the case. Both of these grounds were urged by defendant in his pretrial motion to dismiss the indictment. The trial court responded to the contentions by concluding that "[t]he action taken by the District Attorney constitutes in the Court's judgment reasonable law enforcement, and hence, the showing is inadequate to rebut the presumption that official duty has been properly and Constitutionally exercised." The court also found that there was no invidious discriminatory prosecution. Accordingly, the motion to dismiss the indictment was denied.

5. *Discriminatory Prosecution*

■ Discriminatory prosecution constitutes adequate grounds for reversing a conviction (*People* v. *Winters,* 171 Cal.App.2d Supp. 876, 878 [342 P.2d 538]) when the defendant proves: "(1) 'that he has been deliberately singled out for prosecution on the basis of some invidious criterion;' and (2) that 'the prosecution would not have been pursued except for the discriminatory design of the prosecuting authorities.' " (*People* v. *Superior Court (Hartway), supra,* 19 Cal.3d 338, 348, citing *Murgia* v. *Municipal Court, supra,* 15 Cal.3d 286, 298.) The discrimination must be "intentional and purposeful." (*Murgia* v. *Municipal Court, supra,* 15 Cal.3d 286, 297.) Further, defendant must carry the burden of proof that he has been deliberately singled out in order to overcome the presumption that "[prosecutorial] dut[ies have] been properly, and constitutionally exercised." (*In re Elizabeth G.,* 53 Cal.App.3d 725, 733 [126 Cal.Rptr. 118].) ■ With these rules in mind, we examine defendant's contentions and the evidence adduced at the hearing on the motion to dismiss the indictment.

---

[30]We denied defendant's motion to consolidate determination of the alternative writ with this appeal. (4 Crim. 9682.)

Defendant attempted to portray himself as the innocent victim of District Attorney Hicks' deliberate scheme to "catch him" in some illegal activity. In this case, the activity was defendant's use of his staff for campaign work. He makes much of the fact that no other office holder has *ever* been prosecuted for such activity. He alleges that his prosecution was part of a systematic effort by the district attorney to prosecute members of a local political organization (of which defendant was a member) for a variety of crimes. He further alleges that those officials associated with the rival political group (of which Hicks is a member) committed similar acts, yet escaped prosecution at the hands of the district attorney. Finally, he contends that his prosecution was precipitated by personal animosity, which had been brought on by an eight-year-long dispute between himself and Hicks.

As to his first claim, defendant is incorrect in stating that no other official has ever been prosecuted for using his staff in a political campaign. In *People* v. *Sperl, supra,* 54 Cal.App.3d 640, which was mentioned before, the defendant was convicted for utilizing county marshals to make campaign telephone calls in behalf of the local incumbent. Also cited above was *People* v. *Holtzendorff, supra,* 177 Cal.App.2d 788, in which a housing authority official was prosecuted for using 19 staff members to work on the campaign of an office holder. Therefore, defendant's argument that his prosecution was discriminatory in that no one else has been charged for a similar act is groundless.

As to his allegation that District Attorney Hicks deliberately prosecuted members of one political group, while allowing those of the rival group to escape punishment for similar acts, the evidence presented at the hearing revealed that few members of the latter group were prosecuted, while several of the former were. However, evidence also indicated that investigations were conducted of members of *both* groups, *without discrimination,* whenever complaints were filed against them, and, for a variety of seemingly sound reasons (i.e., insufficient evidence to convict) many members of the latter group were never brought to trial.[31] While it might have been possible for the trial court to believe that a systematic plan of discriminatory prosecution was in operation, the court's review of the evidence "fail[ed] to reveal . . . that the District Attorney embarked upon a systematic program of intentional and purposeful invidious discrimination." We are required to accept the trial

[31]Defendant, himself, had, in 1969 and 1972, three complaints lodged against him in the district attorney's office which did not result in prosecutions.

court's finding because it is supported by substantial evidence. This position is further bolstered by the fact that we are unpersuaded that defendant has met the heavy burden of proof placed on anyone who attempts to use the defense of discriminatory prosecution. (*In re Elizabeth G., supra*, 53 Cal.App.3d 725, 733.)

Finally, defendant claims that the animosity between himself and Hicks brought about his prosecution. The evidence indicates that there was a certain amount of friction between the two. They were, indeed, members of rival political groups, and, from 1968 to 1975, did occasionally clash over the policies of the district attorney's office.[32] That friction seemed strongest in 1975, when one of the leaders of defendant's group came under investigation by the district attorney's office. In June of that year, defendant and a number of other supervisors voted to have 22 investigators transferred from the district attorney's office to the sheriff's department. This action alarmed the district attorney, who believed that defendant and other board members were controlled by the individual who was then under investigation. District Attorney Hicks believed that the transfer was a deliberate attempt to stymie the investigation of this individual. Thereafter, defendant and Hicks exchanged public insults and Hicks publicly announced his suspicions about defendant's motive in voting for the transfer. Our task here is to decide if the friction that existed between defendant and the district attorney brought about defendant's prosecution. This can best be accomplished by reviewing the evidence relative to how the prosecution began and how it proceeded.

In 1975, Michael Capizzi served as director of the "Special Operations" division of the district attorney's office. One department in "Special Operations," called "Special Assignment," handled investigations of office holders. Capizzi testified at the hearing that "Special Assignment" investigations usually began with private citizen complaints or leads from various sources. Witness accounts of the offenses would then be taken and verified, and the "law" on the subject would be checked. Capizzi usually made the final decision to take a case to the grand jury. Hicks did not evaluate the "Special Assignment" cases, but he was kept informed of their progress.

---

[32]Each year, the budget for the district attorney's office had to be approved by the board of supervisors. Defendant was opposed to the proposed expenditure of funds for the prosecution of so-called victimless crimes.

The mid-1970's were busy times for the "Special Assignment" office. Many local officials, *on both sides of the political fence,* were being investigated and/or prosecuted for a variety of offenses. Among them were two members of the political group to which the district attorney belonged.[33] Another investigation by that office was based on a complaint against the Orange County Assessor's office. It resulted in the prosecution of 11 officials and employees for using county time to distribute election materials. Apparently, no one was safe from the vigilant eye of the "Special Assignment" office.

In early July 1975, Robert Dougherty contacted Hicks with the information about defendant which Dawn Papp had reported. Hicks immediately turned the matter over to Capizzi, giving him no instructions relative to the case. Thereafter, the district attorney took no active role in the investigation or prosecution, except that he was informed of its progress and he was consulted once before the case was submitted to the grand jury. After hearing Ms. Papp's account, Capizzi reached a "preliminary analysis," if she was telling the truth, that the case was of sufficient magnitude to be brought before the grand jury. Capizzi then wrote to Jack Winkler of the Attorney General's office to request the assistance of that office in the investigation and prosecution of the defendant. The Attorney General's office sent three investigators to Orange County, but declined to assume the prosecution of the case because the district attorney's "past track record had been excellent in fairly and impartially investigating and prosecuting cases, and [the Attorney General's office was] quite sure that [the district attorney's office] handled this one in the same fashion."

Before deciding to take the case to the grand jury, Capizzi discussed it with Hicks, two other members of the district attorney's staff, and investigators from the district attorney's and Attorney General's offices.

At the hearing, Capizzi testified that he was aware of the differences between the defendant and Hicks, but that he was not at all influenced by this in his decision to bring the case before the grand jury. Hicks also testified, although he and defendant disagreed about policy and politics, that he had no personal animosity toward him.

The trial court found that no deliberate discrimination had taken place, and that the investigation and prosecution were proper. In our

---

[33] One of the two, LeRoy Rose, was a member of the board of directors of that group.

view, the above recited facts constitute substantial evidence to support the court's position. Therefore, we cannot agree with defendant that he was discriminatorily selected for prosecution.

### 6. Conflict of Interest

 Defendant claims that a conflict of interest prevented District Attorney Hicks from properly performing his duties in relation to the prosecution. In his brief before us, defendant cites as bases of the conflict: (1) the fact that a civil suit between an association of county employees and the County of Orange was pending during the investigation and prosecution;[34] (2) the fact that several members of the district attorney's office had to testify during the proceedings; and (3) the personal animosity between defendant and Hicks.

The law on conflicts of interest is contained primarily in *People* v. *Superior Court (Greer)*, 19 Cal.3d 255 [137 Cal.Rptr. 476, 561 P.2d 1164]. Therein, the mother of a murder victim worked for the district attorney's office, in the department charged with the prosecution of the defendant. The victim's wife and her companion (Greer) were held to answer for the crime. The death had allegedly been brought on by a dispute between the victim and his wife over the custody of their child. The victim's mother stood to gain custody of the child if the couple were convicted. There were a number of other entanglements, all of which persuaded the trial court that the district attorney should withdraw from the case. The court then ordered the Attorney General to conduct the prosecution, but he refused to do so on the ground that the separation of powers doctrine prevents such "re-assignment" of prosecutions even when the conflict of interest present was serious.

The Supreme Court responded that while conflicts serious enough to require disqualification of the district attorney are rare, "a trial judge *may* exercise his power to disqualify a district attorney from participating in the prosecution of a criminal charge when the judge determines that the attorney suffers from a conflict of interest which might prejudice him against the accused and thereby affect . . . his ability to impartially perform the discretionary functions of his office." (*Id.* at p. 269; italics added.)

---

[34]In his reply brief, defendant also cites two other cases which involved the district attorney and himself. Because those cases were not included by defendant in his earlier brief, we need not consider them. (Defendant claims they are mentioned in the body of his pretrial motion to dismiss, but we are unable to find such a reference.) However, the analysis we apply to the case mentioned above applies equally to these other two.

It is important to note that *Greer* merely states that the trial court *may*, within its discretion, excuse the district attorney, not that it must. Because the decision whether or not to disqualify is within the discretion of the court, it may be overturned on appeal only if this discretion is abused.

Turning first to defendant's reference to the suit brought by the employees' association, we note that the Supreme Court in *Greer* stated, "[n]or should a prosecutor try a defendant with whom he is embroiled in civil litigation." (*Id.* at p. 261, relying on *Sinclair* v. *State*, 278 Md. 243 [363 A.2d 468], and *Ganger* v. *Peyton*, 379 F.2d 709.) In *Sinclair*, the defendant was accused of passing bad checks. The prosecutor was also the attorney for the bank upon which the checks were drawn. In addition, in an earlier civil suit, brought against the defendant, the district attorney had represented the opposing party and had warned defendant, if he persisted in filing an appeal in that suit, that the district attorney would prosecute defendant for passing bad checks. Under these circumstances, the court found that an evidentiary hearing into the conflict of interest issue was necessary. In *Ganger*, the state prosecuting attorney assigned to a wife beating case also represented the wife in her divorce action that was based on the beating incident. The defendant claimed that the attorney offered to drop the criminal charges against him if he would agree to a property settlement favoring the wife (the attorney's fee in the divorce action depended on the amount of the wife's settlement). The court found that there was a conflict of interest.

The facts in *Greer*, *Sinclair* and *Ganger* reveal intense personal involvement of district attorneys in the very cases they are called upon to prosecute. In contrast, the suit between the employees' association and the county involved an effort to compel the board of supervisors to grant pay raises to deputy district attorneys and public defenders commensurate with the raises enjoyed by other county workers. Because of the nature of defendant's position as supervisor, such suits were not uncommon, and the fact that this particular one occurred does not, in itself, establish a conflict of interest, as it did in *Greer*, *Sinclair* and *Ganger*.

Next, defendant claims that the district attorney's office should not have prosecuted the case because Hicks, Capizzi and several investigators from the district attorney's office were called to testify. We note first that the members of the district attorney's office testified only at the pretrial discriminatory prosecution hearing and not at the trial on the

merits. We further observe that their testimony at the pretrial motion was necessitated by the very nature of defendant's claim of discriminatory prosecution. It is apparent to us, because ". . . a claim of discriminatory prosecution generally rests upon evidence completely extraneous to the specific facts of the charged offense . . ." (*Murgia* v. *Municipal Court, supra,* 15 Cal.3d 286, 293, fn. 4), that defendant was in no way denied a fair trial on the merits of his guilt or innocence by the testimony of the district attorney staffers at the pretrial motion hearing.

Finally, defendant contends that the differences of opinion between himself and Hicks constituted a conflict of interest which tainted his prosecution.[35] We have already discussed the presence of substantial evidence to the contrary. The investigation and prosecution proceeded as did most others in the "Special Assignment" office. There was no evidence that the district attorney "went after" the defendant in an effort to "get him" for some offense. In fact, Capizzi passed up three prior opportunities to prosecute defendant for trespassing and falsification of a letter. In addition, both Hicks and Capizzi denied being influenced by the confrontations between the district attorney and defendant. Such confrontations can be expected when one person or body holds the purse-strings of another. By no stretch of the imagination can we view the entanglements between Hicks and defendant here to be of the number or magnitude as those that existed in *Greer.* We therefore agree with the trial court that the prosecution was fair.

The judgment is affirmed.

Kaufman, Acting P. J., and Morris, J., concurred.

A petition for a rehearing was denied February 15, 1978, and appellant's petition for a hearing by the Supreme Court was denied April 13, 1978.

---

[35]Defendant claims that prosecutor Jack Ryan was biased against him. To support this, he contends that, at some point, Ryan called him an "asshole." However, defendant fails to cite us to such a reference in the record, and we are not obliged to accept his undocumented version of the facts.