[No. F008848. Fifth Dist. July 6, 1988.]

BENNY E. WEBB, Petitioner, v.
THE SUPERIOR COURT OF TULARE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

James Heusdens for Petitioner.

No appearance for Respondent.

Gerald F. Sevier, District Attorney, Melinda M. Reed, Deputy District Attorney, John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, James T. McNally and Raymond L. Brosterhous II, Deputy District Attorneys, for Real Party in Interest.

## OPINION

HAMLIN, Acting P. J.—Petitioner Benny E. Webb (petitioner) seeks a writ of prohibition to prevent the Tulare County Superior Court from conducting further criminal proceedings against him in action No. 24994. In that action petitioner is charged with eight counts of misappropriation of public funds in violation of Penal Code section 424, subdivision 1.[1] Petitioner contends the trial judge erroneously denied his section 995 motion to set aside the information against him.

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

This court issued an order requiring respondent superior court to show cause why the relief sought by petitioner should not be granted and staying trial pending determination of this petition or further order of this court. Petitioner urges that there was no reasonable or probable cause to commit him on the information in that he is charged in all counts with misappropriation of public money in violation of section 424, subdivision 1, a statute that applies only to officials charged with the receipt, safekeeping, transfer, or disbursement of public moneys, which he is not. Petitioner also asserts that respondent superior court erred in failing to read all the transcripts of the preliminary hearing and the grand jury proceedings as promised so as to be able to consider all the testimony therein before ruling on his motion and in publicizing its ruling before filing it with the clerk of the court. We find petitioner's contentions unmeritorious and will deny his petition for writ of prohibition.

## THE FACTS

At the time the information was filed against petitioner, he was a supervisor for the Fifth Supervisorial District of Tulare County (County). Morton Avenue in the City of Porterville (City) is within that district. In 1984 the south side of Morton Avenue from York Street to about 300 feet east of Walch Street was unimproved with curbs and gutters, and many of the residents experienced problems with flooding. This area on Morton Avenue is one in which there are both City and County properties, so that some of the property fronting on Morton Avenue was in the City and the remainder was in the County.

In 1984 petitioner approached some of the Morton Avenue property owners to see if they would be willing to give the front several feet of their property in exchange for curbs and gutters being installed on the widened southern boundary of Morton Avenue. In February 1984, landowners Alice Taylor and Jacqueline Griffin agreed and signed contracts to have the improvements installed. The check from the County for her property was given to Taylor by petitioner; a check from the City was given to Griffin. They endorsed the checks in petitioner's presence and returned them to him as agreed. Petitioner turned the checks over to Manuel Rodriguez, the cement contractor who installed the curbs and gutters for both properties. The checks were in amounts that far exceeded the costs of those improvements to the properties of Taylor and Griffin.

Later in the year, five other property owners agreed with petitioner to give the front several feet of their properties in exchange for the installation of curbs and gutters. Petitioner then went to the City public works department staff and at least one of the members of the city council to see if they

would be willing to go along with his plan to have curbs and gutters installed on the remainder of the stretch of Morton Avenue under consideration. Petitioner's plan was that the City would allocate $23,250 to complete all of the improvements within the Morton Avenue improvement project. Part of the plan was that checks would be drawn on the City's treasury made payable to the five property owners and that those checks would pay for the curbs and gutters not only in front of the property owned by those named individuals but for curbs and gutters for all of the property within the Morton Avenue improvement project.

The city council approved the acquisition of the property of the five property owners and authorized the disbursement of the warrants, ostensibly in payment for the fee interest in property being conveyed by the private property owners to the City. The checks were then delivered to petitioner, who delivered them to the individual property owners and instructed them, according to their prior agreement, to endorse the checks and hand them back to him in the same transaction. That is to say, on each occasion, petitioner personally took the check to the property owner, handed the check to the property owner for signature, waited while the check was signed, and immediately took back the check from the property owner. The checks were then taken by petitioner to Rodriguez, who deposited them in his bank account and proceeded to install the curbs and gutters all along the properties within the Morton Avenue improvement project. All the property owners believed the value of their property was the same as the cost of the improvements to their property, and no one intended that any amount payable to him or her be used to improve anybody else's property.

In another matter (the subject of count VIII of the information), petitioner prevailed upon a friend of his, Peter Ruddock, to purchase from Union Oil Company (Union) a parcel of property located at the northeast corner of Main Street and Vandalia, generally described as 680 South Main Street, Porterville, for $45,000. Immediately thereafter, the parcel purchased was split into two lots pursuant to petitioner's directions. The lot comprising three-fourths of the original parcel was then purchased for $50,000 by the Tulare County Board of Supervisors (Board) at petitioner's request. Part of the additional $5,000 went to Ben Ennis, a real estate agent, as a commission he did not claim and which he donated to Senior Gleaners, a senior citizen organization, with the stipulation that it be used to pay the engineering firm that did the necessary work to accomplish the lot split. At petitioner's direction, Ruddock gave to Porterville Youth Incorporated the second lot into which the original parcel was split.

## 1. TAYLOR PROPERTY (COUNT I)

### A. *Testimony of Alice Taylor*

Alice Taylor testified that petitioner approached her regarding the installation of curbs and gutters in front of her house in exchange for a strip of frontage from her property. She signed a contract with Manuel Rodriguez for the work but did not recall reading the contract. She also signed a deed and the county warrant in payment for the strip of her property and gave the check back to petitioner; petitioner did not tell her that funds from her warrant would be used to pay for improvements to other property and she never agreed to such a deal. Alice Taylor's contract with Rodriguez shows that the cost of the installation of her curbs and gutters was $1,458. The check she signed and returned to petitioner was in the amount of $3,240.

### B. *Testimony of County Staff*

Doug Wilson, the public works director for the County, at petitioner's request, took an item to the Board to authorize the funding of a construction project at the corner of Rose Lane and Morton Avenue. The Board authorized approximately $6,000 for that work. The purpose of the money was to pay costs involved in the acquisition of rights-of-way and some cleanup on the private road, Rose Lane. Wilson testified that the rights-of-way were to be purchased from Griffin and Taylor, owners of the southeast and southwest corners of Rose Lane and Morton Avenue. Actually, it was the City that paid for the improvements on Griffin's property.

Wilson testified that the normal procedure after the Board had passed the agenda item would be to have an appraisal done and to negotiate with the property owners for the acquisition. Once the negotiations were complete, County staff would return to the Board for acceptance of the right-of-way deeds and authorization for payment. The County would typically go to bid for the installation of curbs and gutters. Wilson testified that he was not aware of any appraisals being done on the properties on Morton Avenue.

Wilson further testified that Manuel Rodriguez did the curb and gutter work on the Morton Avenue project and that the County did the pave-out work after the curbs and gutters were installed. Rodriguez was to reimburse the County for the pave-out work that was done within the city limits but for which the County paid the entire amount. At the time of the preliminary hearing in 1987, Rodriguez had not yet paid the County for the pave-out work.

Wilson also testified that following the construction on the intersection of Rose Lane and Morton Avenue, petitioner contacted him again regarding completion of the project on the rest of Morton Avenue, but that he (Wilson) was not "necessarily" prepared to recommend that revenue sharing money be used to complete the Morton Avenue improvement project and that there were no road funds budgeted by the County for the project.

Wilson got the Taylor deed from petitioner, but the Board authorization called for a fee interest and Taylor gave only an easement.

## 2. REMAINDER OF MORTON AVENUE (COUNTS II, III, IV, V, VI, AND VII)

### A. Testimony of City Officials

Steve Tree, a member of the Porterville City Council and the mayor in 1984, testified that he had a conversation with petitioner regarding curbs and gutters on Morton Avenue. Petitioner told him that property owners were willing to deed the property for the cost of improvements. They discussed the City purchasing the property with the improvements already on it. Tree remembered some discussions regarding, "How are we going to decide which property owner gets paid what?" since "it would be one lump project." On cross-examination, Tree testified that the payment plan was that the checks given to petitioner would pay for the entire Morton Avenue improvement project, but on redirect he testified that he was not aware that the money would be used for other than the five properties because he did not know how many properties were on the street. He did understand that the checks would be cut for individual property owners and it would all be coming back for the improvements.

Gene Klatt testified that in 1983 and 1984 he was employed by the City as an engineer. In 1984 petitioner contacted him regarding the possibility of the City and the County doing some joint work on the Morton Avenue drainage problem. Klatt testified that the south side of Morton Avenue was largely in the County. When asked why the City would become involved in improvements on the County's property, he said: "[T]hat portion of the county was essentially a county island, fell within city jurisdiction, or within the city's sphere of influence. . . .

"Morton is also a designated east-west arterial through the city. . . . So that in all likelihood, most of that county area would eventually be annexed into the city. . . .

"So that completion of Morton Avenue would benefit the city because it served primarily city traffic in and around the area, it was a major arterial;

and would benefit the county residents, because they had been asking for the street to be improved."

In discussing the City's involvement in the Morton Avenue improvement project, Klatt said:

"I don't recall how the number came about, but we discussed that if the city were to engage contractors to perform the work, because of bonding requirements, insurance payments, and so forth, our contract prices tend to be higher than a private contract. That if the city would contribute monies to this construction, it was felt that the property owners, acting through an agent, could hire a contractor, secure the work at a lesser cost than the city could.

"And in subsequent discussions with both Mr. Webb and the city manager, it was arrived at that the city would contribute, I believe it was twenty-four thousand five hundred. And an agenda item was prepared [by Klatt] describing that monies and justifying the costs on the basis of the improvements and land value."

Klatt later testified that the city council, to the best of his knowledge, was aware that a proposal had been put forth by petitioner that for a payment of $23,250, the City's share, the south side of Morton Avenue would be improved, and the City would have either fee title or use the existing County easement title for that roadway.

Charles Huffaker testified that he was the city manager in 1984. He met with petitioner and his attorney on June 21, 1984, to discuss the curbs and gutters on Morton Street; he discussed with all five of the city council members in 1984 the idea of expending the City's money for the improvement of property within the County; he was not aware of any plan by which the $23,250 would be used for anything other than to compensate the property owners for their property and improvement as per the agenda item.

Manuel Rodriguez testified that he was a contractor, that he met with petitioner to discuss the Morton Avenue improvements, that petitioner obtained encroachment permits from the City, and that petitioner paid him with the checks endorsed by the landowners and told him whom to pay. Rodriguez indicated that petitioner gave him "a whole bunch [of checks], about ten of them." He received Taylor's check for $13,240 in March and the others in August. Rodriguez still owed the County about $4,000 for the pave-out work that was done in 1984 on the Morton Street project.

### B. *Testimony of Landowners*

Chois Webb (count III) testified that petitioner contacted him with the proposal to exchange property for curbs and gutters with the understanding that he would have to pay some extra; petitioner later brought the deeds to Webb, who signed them in his home. Webb further testified that petitioner brought him a check which he signed and gave back to petitioner. When asked why he signed the back of the check, Chois Webb answered, "I signed it because I thought it was five hundred dollars. I signed it because it was for the curbs and gutters. We didn't want to be contrary to any of the community that we're neighbors. I wanted to go along with the group on Morton. And we signed it because we were interested also in curbs and gutters." The check was actually for $5,719.50. Chois Webb testified that he did not look at the amount.

Vivian Webb, the wife of Chois Webb, testified that she signed the deed and that she signed the check under the same circumstances and belief as her husband.

Edythe Keck Green (count II), who is by her own account, "an old lady, almost eighty years old" who does not claim to be "so good at thinking anymore," was approached by petitioner with the idea of having curbs and gutters installed. Apparently her only concern was with the cedar trees in her front yard. She testified that she signed the check for $3,464 and gave it back to petitioner.

Bess Ball (count IV) testified that petitioner had contacted her, telling her she could get curbs and gutters for $500. She testified that petitioner brought her the check for $4,650, that she signed it and gave it back to him. She understood less of the plan and transaction than some of the others since she believed she had donated her property to the City and could not understand why they were giving her a check that she had to give back to petitioner. She told petitioner it was just like stealing from her.

Jacqueline Griffin (count VI) testified that petitioner contacted her regarding the installation of curbs and gutters; she signed a contract for the installation of the curbs and gutters; petitioner brought her the check from the City and said, "This will cover it"; she signed the warrant and returned it to him. She did not intend to pay for anybody else's curbs and gutters and there was no deal for her warrant to cover the rest of the street; she believed the property she gave was a straight tradeoff for the improvements. Griffin's contract with Rodriguez shows that the cost of the installation of her curbs and gutters was $1,538. The warrant she signed and returned to petitioner was in the amount of $3,999.

Ruth Cook Alley testified that petitioner approached her on several occasions but she persisted in telling him that she did not want curbs and gutters. Finally, after several visits she agreed to go ahead, as petitioner assured her it was not going to cost her any money. She testified that she signed a grant of easement which was later recorded but received no money and paid none.

Vee LeDuc, another owner of property within the Morton Avenue improvement project, testified much the same as Ruth Cook Alley.

Elven Atkinson testified that Manuel Rodriguez first contacted him and then he spoke to petitioner regarding the curbs and gutters. Atkinson indicated that he and petitioner discussed the possibility of a tradeoff, that is, trading the right-of-way for curbs and gutters, but that petitioner told him the County really did not have the money and that if he wanted curbs and gutters he would have to pay for them. He testified that the deed "for the right-of-way" he executed had not been delivered or recorded, but he paid $500 to Rodriguez for the curb and gutter work.

Judith Bowles Treadwell (count V) testified that she is employed by the City in the engineering and building division. Petitioner contacted her to see "if we'd be interested in dedicating, you know, or moving, you know, giving some of our land in exchange for curbs and gutters."

She testified that she signed a deed of easement in her kitchen in petitioner's presence and delivered it to him. There was no discussion between her and petitioner regarding payment of any money for her property, but she received a check for $5,417.25 from petitioner and endorsed and returned it to him.

### 3. MAIN STREET PROPERTY (COUNT VIII)

Ben Ennis, a real estate broker, testified that Peter Ruddock bought the property located at 680 South Main by offer dated August 6, 1985. The purchase price was $45,000, and Ennis received a real estate commission for producing Ruddock as the buyer.

Randall Gibson, the real estate manager for Union Oil, the seller of the property to Ruddock, testified that he had a conversation with petitioner regarding the property located at 680 South Main and told petitioner on August 6, 1985, that Union would be happy to entertain condemnation proceedings or a letter of intent regarding condemnation. At that time, petitioner said he did not think he could do that in a timely fashion. Petitioner drove to Los Angeles the next day (Aug. 7, 1985) to deliver Rud-

dock's offer to Union Oil and gave it personally to Gibson. Gibson assumed that petitioner was acting as a County official.

Peter Ruddock testified that he purchased the property located at 680 South Main Street after petitioner contacted him and asked him to buy the property. Ruddock felt he was doing a favor for the County, for "old folks and . . . some kind of a youth organization." Ruddock testified that he was not interested in making a profit on the deal and that petitioner had suggested the lot split. He also testified that he understood that his escrow costs would come out of the extra $5,000 to be received on the sale to the County.

Vicky Hildreth, the office manager for First American Title in Porterville, testified that petitioner opened the escrow on the Ruddock sale to the County and the conveyance to Porterville Youth Incorporated but that petitioner signed no documents. She also testified that petitioner supplied the property descriptions.

Don Monk testified that he is a civil engineer employed by R. L. Schaffer and Associates. In 1985 he performed a survey of the South Main Street property. He discussed the survey with petitioner and drew up legal descriptions for the two parcels into which the South Main Street property was split.

Lloyd Kuhn, the director of building services for the County, testified that petitioner requested him to look at the property located at 680 South Main Street to determine its accessibility for the handicapped. Petitioner further told Kuhn that surveyors were going to break off a portion of the lot. Kuhn testified that petitioner asked that an item be included on the Board's agenda regarding a notice of intent that the County would purchase the property located at 680 South Main Street for $50,000. Kuhn got the legal description of the property in question from Shirley Valentine, a County property technician.

Clyde Gould, Tulare County District 1 Supervisor, testified that he knew of the lot split before the County purchased the South Main Street property but that he did not know the property had just been purchased for $45,000 and the County was only purchasing three-quarters of it. He testified he still would have voted in favor of it if he had known.

John Conway and Lori Mangine, supervisors for districts 2 and 3, respectively, testified they would not have voted in favor of the acquisition if they had been aware of petitioner's involvement.

Leroy Swiney, the district 4 supervisor, testified that he would not have voted in favor of the acquisition if he had known of petitioner's involve-

ment, since he believed that the County got less property than originally thought.

Shirley Valentine, a property technician employed by the County, testified that petitioner told her he had Ruddock buy the property to keep for the County because the County could not get the money quickly enough. Lloyd Kuhn, her supervisor, knew about the lot split and advised her that they could not complete the purchase until the lot was split.

On rebuttal, Lloyd Kuhn testified that he found out the details after the escrow had closed, that he knew the lot split had to be accomplished before escrow could close, but he never knew the price of the property before the split had been $45,000. Shirley Valentine testified that Kuhn had told her the price had been $45,000.

Reba Quiram, the treasurer of the Senior Gleaners, testified that she received a check for $4,351.39 from Ennis Realty and that petitioner delivered the check to her with instructions to pay certain bills, including that of R.L. Schaffer and Associates, the company that did the survey and engineering work for the lot split.

Thomas Logan testified that he was the auditor for the County and that he had a travel claim from petitioner for 372 miles on August 7 for a trip to Los Angeles. Counsel stipulated that petitioner had submitted an expense voucher for lunch on that same day in the amount of $4.80.

### Discussion

### I.

### *Standard of Review*

■ An information should not be set aside or prosecution thereon prohibited if there is some rational ground for assuming the possibility an offense has been committed and the accused is guilty of it. (*People* v. *Slaughter* (1984) 35 Cal.3d 629, 637 [200 Cal.Rptr. 448, 677 P.2d 854].) Evidence that will justify a commitment need not be sufficient to support a conviction. (*Caughlin* v. *Superior Court* (1971) 4 Cal.3d 461, 464 [93 Cal.Rptr. 587, 481 P.2d 211].) So long as there is some evidence in support of an information, a reviewing court will not inquire into its sufficiency. "Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].)

■ "The term 'sufficient cause' is generally equivalent to 'reasonable and probable cause,' that is, such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People* v. *Uhlemann* (1973) 9 Cal.3d 662, 667 [108 Cal.Rptr. 657, 511 P.2d 609].) On appeal, the issue must receive the "independent scrutiny appropriate for review of questions of law." (*People* v. *Slaughter, supra,* 35 Cal.3d at p. 638.) The reviewing court must decide only whether the magistrate who held the defendant to answer could reasonably have reached the conclusion it did. (*Rideout* v. *Superior Court, supra,* 67 Cal.2d at p. 474.)

II.

*Challenge to Applicability of Section 424, Subdivision 1*

All the charges against petitioner were based on misappropriation of public money in violation of section 424, subdivision 1, which provides: "Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either: [¶] 1. Without authority of law, appropriates the same, or any portion thereof, to his own use, or to the use of another; . . . [¶] . . . [¶] Is punishable by imprisonment in the state prison for two, three or four years, and is disqualified from holding any office in this state."

Prior to 1987, section 426 provided: "The phrase 'public moneys' as used in the two preceding sections [§§ 424 and 425], includes all bonds and evidence of indebtedness, and all moneys belonging to the state, or any city, county, town, district, or public agency therein, and all moneys, bonds, and evidences of indebtedness received or held by state, county, district, city, town, or public agency officers in their official capacity."

We must determine, then, if the evidence adduced at the preliminary hearing shows reasonable and probable cause to believe that petitioner violated section 424, subdivision 1. ■ We begin by noting that any such violation is not a specific intent crime. (*People* v. *Dillon* (1926) 199 Cal. 1 [248 P. 230].) Thus section 424, subdivision 1, does not require proof of an intent to steal or misappropriate, but rather the intentional doing of an act that results in the misappropriation. (*Dillon, supra,* at p. 7.)

As can be seen through a review of the voluminous and convoluted facts, petitioner's actions and activities were highly irregular and outside the usual procedures employed by public officials. The question, though, is, based upon a review of the evidence presented at the preliminary hearing,

whether there was some rational ground for the magistrate to assume not only that some violation of law had occurred but that a violation of section 424, subdivision 1, had occurred and petitioner had committed the violation.

This is obviously not the typical case of a violation of section 424, subdivision 1. That section is more often used in situations where a public employee or official, in the course and scope of his or her employment, receives money and converts the money to his or her own use rather than turning it over to the public entity. (See, for example, *People* v. *Best* (1959) 172 Cal.App.2d 692 [342 P.2d 314] [bail money accepted by police officer who never turned money over to city]; *People* v. *Griffin* (1959) 170 Cal.App.2d 358 [338 P.2d 949] [deputy municipal court clerk accepted bail money but failed to deliver it to court].) Another typical scenario is where the employee in his or her official capacity, having access to public moneys and having the authority to disburse the public moneys for certain purposes, embezzles the money to his or her own purpose. (See *People* v. *Little* (1940) 41 Cal.App.2d 797 [107 P.2d 634] [city employee having access to city funds embezzled them].)

The charges against petitioner which he seeks to set aside do not involve acts that fit either of the typical scenarios. What petitioner did that provides the basis for the charges in counts I through VII was use his position as a member of the Board and the trust and respect that position carries with it to implement a scheme for the improvement of Morton Avenue that he would not have been able to accomplish through the ordinary and, indeed, legal channels. Testimony was adduced that County money was not available for the improvement project and that accounted for petitioner's scheme to get the money from the City even though the County property was being improved to the benefit of both the City and the County.

In *People* v. *Battin* (1978) 77 Cal.App.3d 635, 649 [143 Cal.Rptr. 731, 95 A.L.R.3d 248], cert. den. *Battin* v. *California* (1978) 439 U.S. 862 [58 L.Ed.2d 171, 99 S.Ct. 183], the defendant argued that he did not "disburse" public moneys within the meaning of section 424, subdivision 2, because he did not have actual custody of the moneys paid to his staff. That court cited with approval the decision in *People* v. *Qui Mei Lee* (1975) 48 Cal.App.3d 516 [122 Cal.Rptr. 43] that the application of section 424 is not limited to officers who have actual custody of public funds. The court noted that under established case law the defendant's conviction of misuse of public funds could be upheld because the records used as the basis for improper disbursement of county funds by third parties were prepared by or under the direction of the defendant (a county supervisor) with knowledge of the intended purpose of those records.

■ Thus, for a public official, and particularly a county supervisor, to violate section 424, it is not necessary that he or she have actual custody of the public moneys. The fact that petitioner was not directly, in his job description or the common responsibilities of his position, charged with receipt, safekeeping, transfer or disbursement of public funds does not necessarily preclude a prosecution under section 424. It is sufficient if the public official controls public funds so as to cause their expenditure for nonpublic purposes. (*People* v. *Qui Mei Lee, supra,* 48 Cal.App.3d at p. 523.)

### III.

*Counts II Through VII Based on Misappropriation of City Funds*

■ As petitioner points out, counts II through VII of the information allege misappropriation of warrants issued by the City to various individual owners of property within the confines of the Morton Avenue improvement project. Since these are City funds and petitioner is not a City official, petitioner contends he cannot be charged with misappropriating them. Additionally, petitioner urges that after each of the warrants for payment of City funds was delivered to the Morton Avenue property-owner/payee, it no longer represented public moneys. All of these arguments are based on the language of section 424, subdivision 1, and related sections without citation of authority.

In *People* v. *Wall* (1980) 114 Cal.App.3d 15 [170 Cal.Rptr. 522], the defendant parking meter collector contended the evidence was not sufficient to support his conviction of unauthorized appropriation to his own use of public moneys. (§ 424, subd. 1.) The court held that "section 424, subdivision 1 and section 425 were intended to punish those charged with the receipt and transfer of moneys belonging to the state or a subdivision thereof and who misappropriate such moneys when there is a nexus between the moneys they are charged with and the moneys misappropriated." (*Wall, supra,* at p. 22.) It then concluded that the required nexus existed in that case even though the defendant was not acting in his official capacity when he emptied the parking meter. The defendant was charged with the receipt and transfer of the parking meter moneys that he misappropriated, "using the very instrumentalities of his occupation to gain possession thereof." (*Ibid.*)

In this case petitioner received the City warrants in his capacity as a county supervisor, he delivered the warrants to the various property owners pursuant to arrangements with City officials, and the property owners endorsed the warrants and returned them to petitioner in his capacity as a

county supervisor pursuant to arrangements he made with them in that capacity. Petitioner then exercised his control over those endorsed warrants to pay for the Morton Avenue improvements in their entirety without regard to whether a particular property owner was paying more than his or her proportionate share without his or her knowledge or consent and without regard to whether County funds were being used for County purposes or City funds were being used for City purposes.

Under these circumstances, petitioner's argument that he cannot be guilty of misappropriation of the City's public moneys because he was not the person charged with the receipt, safekeeping, transfer or disbursement of the City's public moneys is not persuasive. The fact is petitioner gained control of the City's public moneys in his capacity as a supervisor and exercised that control in the same capacity. Here, the preliminary hearing transcript demonstrates that petitioner was the instigator and the dominant figure in the plan whereby moneys belonging to the City were misappropriated. Endorsement of the warrants by the individual property owners and immediate redelivery to petitioner did not affect the character of the warrants as public moneys. No one involved in authorizing the issuance of the warrants or their delivery had any intention that the warrants were to compensate the individual landowners for their property. There is no testimony in the record that any of the property owners considered the amount payable to him or her pursuant to the warrant as his or her money. Each owner understood he or she was exchanging a strip of his or her property for the Morton Street improvements to the property exchanged. The owners served only as conduits to make City funds available to the contractor in payment for installing the improvements.

We conclude that the evidence introduced at the preliminary hearing as to counts II through VII established reasonable and probable cause to believe the funds for the Morton Avenue improvements were received by petitioner in his official capacity as county supervisor pursuant to a plan he worked out in his official capacity to misappropriate those public funds. Thus there exists the required nexus between the moneys he received in his official capacity and the moneys misappropriated. (*People* v. *Wall, supra,* 114 Cal.App.3d at p. 22.)

IV.

*Count VIII—The County's Purchase of 680 Main Street, Porterville*

■ Petitioner urges that he had no duty to reveal to the other members of the Board the unusual circumstances underlying its purchase of one of the parcels into which the unimproved lot referred to as 680 South Main

Street in Porterville had been split. Additionally, he contends he did not conceal from the Board any information about the property or the facts underlying its acquisition.

The facts before the magistrate at the preliminary hearing reveal that petitioner prevailed upon a friend of his, Peter Ruddock, to purchase the South Main Street property from Union for $45,000, the listed price. Some six days later petitioner prevailed upon the Board to purchase from Ruddock for $50,000 one of the two parcels into which the South Main Street property had been split. At least a majority of the Board believed it was purchasing the entire parcel of property commonly known as 680 South Main Street, Porterville. In fact, the property purchased represented three-quarters of that property. Ruddock gave the remaining one-quarter of the property to Porterville Youth Incorporated at petitioner's direction.

Also at petitioner's direction, Ruddock used the $5,000 difference between his cost of the entire parcel and the price he received from the County for three-quarters of the parcel to pay escrow costs and to pay Ennis Realty a commission of $4,351.91 on the sale to the County. However, Ennis Realty was not involved in the sale to the County and did not request a commission on that sale. Ennis Realty donated to Senior Gleaners the amount it received from the proceeds of the sale to the County. Petitioner delivered Ennis Realty's check for $4,351.91 with instructions that Senior Gleaners use the proceeds to pay R. L. Schaffer and Associates for the engineering and survey work for the lot split. That lot split was directed by petitioner, and it in no way benefited the County.

We look to petitioner's plan for causing the County to acquire a portion of the South Main Street property to determine whether there is any rational ground for assuming petitioner exercised his control over County funds for any purpose not authorized by law. The evidence offered at the preliminary hearing demonstrated that petitioner knew that the property he asked the Board to purchase from Ruddock could be purchased for $45,000 plus the expenses of sale. When petitioner caused Ruddock to ask $50,000 for it to produce an additional $4,351.91 that petitioner could control as a commission to Ennis Realty that was neither earned, requested nor expected by Ennis Realty, the extra $4,351.91 of County funds were subject to petitioner's control and, in his capacity as supervisor, he used those funds for a purpose not authorized by law.

We conclude that the evidence presented at the preliminary hearing in support of count VIII provided reasonable and probable cause for the magistrate to believe petitioner had controlled County funds to his personal benefit and to the benefit of others in violation of section 424, subdivision 1.

## V.

### *Alleged Failure of Trial Court to Consider All the Testimony Included in the Transcripts*

Petitioner asserts that the trial judge said at the conclusion of argument on petitioner's section 995 motion that over the weekend he would read the entire preliminary hearing transcript (2,021 pages in 11 volumes) and all the transcripts of the grand jury proceedings on indictment (6 volumes, 867 pages). Then the trial judge made and released to the press his ruling on the following Monday and filed the ruling in Tulare County Superior Court on Tuesday. Petitioner argues that it is improbable and nearly impossible that the court could have read all of that testimony over one weekend.

We begin our consideration of this argument by pointing out that the record does not support petitioner's contention that the court failed to read the transcripts. In the absence of any evidence in support of that contention other than defense counsel's assertion that the length of the record precluded such a review within the time available over the weekend, we reach a contrary conclusion based on our examination of the transcripts and the presumption that official duty has been regularly performed (Evid. Code, § 664). ▮ Absent an affirmative showing, as here, that the court neglected to perform its duty to read a preliminary hearing transcript on which the case is submitted, such a presumption is not rebutted. (*People* v. *Chamberlin* (1966) 242 Cal.App.2d 594, 597 [51 Cal.Rptr. 679].)

But even if this court were to accept petitioner's assertion that the trial court failed to read all the transcripts as agreed, we would not be persuaded that petitioner was committed on the information without reasonable or probable cause. (§ 999a.)

## VI.

### *Alleged "Improprieties" by the Trial Court*

Petitioner also argues that the trial court acted improperly after the conclusion of the arguments on his motion to set aside the information in this case by releasing its decision to the news media in advance of filing the decision with the Tulare County Clerk. As with most of petitioner's arguments on appeal, he cites no authority to support his request for relief based on the conduct of which he complains. Even if we accept this contention at full face value, it does not detract from the conclusion we have reached that the preliminary hearing record provides reasonable and probable cause for petitioner's commitment on the information on file in this case.

We deny the petition for a writ of prohibition and dissolve the order staying petitioner's trial.

Stone (W. A.), J., concurred.

**ARDAIZ, J.,** Concurring and Dissenting.—I concur with the majority as to count I which charges petitioner with misappropriation of county funds arising out of the Taylor transaction. Because the majority does not separately address this count, I briefly set forth the relevant facts.

Doug Wilson, the public works director for the County of Tulare (County), testified that the Tulare County Board of Supervisors (Board) authorized $6,000 to fund a construction project at the corner of Rose Lane and Morton Avenue. The money was authorized to acquire a right-of-way and to pay expenses involved in cleanup work to be done on Rose Lane. Wilson testified that the agenda item presented to the Board made no mention of an expenditure for installation of curbs or gutters. The rights-of-way were to be purchased from Griffin and Taylor. The County subsequently authorized the purchase of only Taylor's and not Griffin's right-of-way. Thus, the check petitioner delivered to Taylor was from the County and the check delivered to Griffin was from the City of Tulare (City).

Petitioner represented to both Taylor and Griffin that an easement across their property would be exchanged for the installation of the curbs and gutters. In fact, the county check Taylor signed and returned to petitioner greatly exceeded the cost of the improvement. Both Griffin and Taylor testified petitioner never told them that funds from their checks would be used to improve other property nor did they ever agree to such a deal.

Petitioner delivered the checks to Griffin and Taylor. After the checks had been endorsed and returned to petitioner, he turned them over to Manuel Rodriguez, the contractor who installed the curbs and gutters on Morton Avenue.

Based on the foregoing, the evidence was sufficient to conclude that petitioner violated Penal Code section 424 (herein section 424), subdivision 1, as to count I. As the majority correctly notes, petitioner was charged with responsibility for county funds in his capacity as a county supervisor. The evidence presented at the preliminary hearing indicates that the Board authorized the funds to be used for cleanup and for purchase of rights-of-way, not for the installation of curbs and gutters along Morton Avenue. Moreover, although the Board authorization called for a fee interest, it received only an easement from Taylor. Petitioner caused the funds to be used for installation of curbs and gutters, a purpose not authorized by the

Board. Moreover, as the majority correctly concluded, the endorsement and immediate redelivery of the warrant to petitioner by Taylor did not convert the money from public to private funds.

Although I concur in the result as to counts II through VII, I cannot subscribe to the majority's analysis. Under the majority opinion, petitioner is apparently chargeable under section 424, subdivision 1, because he was a public official who misappropriated public funds. The majority opinion concludes that any time a public official gains control of any public funds based on a misrepresentation as to the proposed purpose of those funds, he can be charged with violating section 424, subdivision 1. The weakness in this position is that it fails to consider the statutory requirement that the public official or "other person" be "charged with" responsibility for those funds.

*People* v. *Wall* (1980) 114 Cal.App.3d 15 [170 Cal.Rptr. 522], on which the majority relies, does not support its conclusion: there the duties of the defendant in his position as a public employee included the responsibility for the funds that were subsequently misappropriated.

In *Wall*, the defendant was employed by the City and County of San Francisco as a parking meter collector. At the beginning of each work day, the equipment necessary to collect the coins was assigned to the collector. At the end of each working day (5 p.m.) the collector returned the moneys collected along with the equipment.

The defendant in *Wall* was observed by a police officer between the hours of 6 and 6:15 p.m. collecting money from meters on Sutter Street. At that time, the defendant was not assigned to collect money on Sutter Street. He was convicted of violating sections 504, 424, subdivision 1, and 425.

On appeal, the defendant argued in relevant part that section 424 was inapplicable because the section applied only "if the public moneys misappropriated came into the possession of the 'officer' in the officer's 'official capacity'." (*Id.* at p. 20.) The defendant argued that because he was not acting in his official capacity when he collected the money, he could not be convicted under section 424. (*Ibid.*)

The court rejected this argument concluding that there was no requirement under section 424 that the funds come into the defendant's possession in his official capacity. (*Id.* at p. 21.) Rather, the court concluded: "section 424, subdivision 1 . . . [was] intended to punish those charged with the receipt and transfer of moneys belonging to the state or a subdivision

thereof and who misappropriate such moneys *when there is a nexus between the moneys they are charged with and the moneys misappropriated.*" (*Id.* at p. 22, italics added.)

The court concluded that the requisite nexus existed stating: "Appellant was a parking meter collector charged with the receipt and transfer of parking meter moneys, moneys belonging to the City and County of San Francisco and it was parking meter moneys that he misappropriated, using the very instrumentalities of his occupation to gain possession thereof." (*Ibid.*)

Thus, in *Wall,* the defendant's duties as a collector included the responsibility for the funds collected from city and county parking meters. Although the defendant was not acting in his official capacity when he collected the money, his duties as a collector charged him with responsibility for the parking meter funds. The funds that he misappropriated were funds taken from the parking meters. Clearly there was a nexus between the funds he misappropriated and the funds with which he was charged.

Concededly, petitioner in the present case might have utilized his position as a county supervisor to acquire city funds. However, unlike *Wall,* petitioner, as a county supervisor, was not charged with responsibility for city funds. The funds petitioner allegedly misappropriated were city funds. Thus, the requisite nexus between the funds he allegedly misappropriated and the funds with which he was charged in his position as a county official simply does not exist.

That petitioner was not charged with responsibility for city funds does not preclude prosecuting him for violation of section 424, subdivision 1. In my view, however, the majority opinion's somewhat tortured construction of the section is unnecessary. I conclude that under the facts of this case, petitioner could be prosecuted as an aider and abettor in the development and implementation of a plan to misappropriate city funds.

In *People* v. *Little* (1940) 41 Cal.App.2d 797, two defendants, Richards and Little, were charged with violating section 424, subdivision 1. Richards pleaded guilty and Little was convicted after a jury trial.

Richards was employed as a bookkeeper and collector for the city-owned and -operated water system. She embezzled a large amount of the funds she collected. Little, although not a city employee, "aided and abetted and advised and encouraged Mrs. Richards in her criminal acts." (*Id.* at p. 805.)

On appeal, defendant Little argued that he could not be found guilty of violating section 424, subdivision 1, because he was not ". . . 'charged with

the receipt, safekeeping, transfer or disbursement of public moneys.' " (*Ibid.*) The court rejected this argument relying on Penal Code section 31 which provides in relevant part: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid or abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." Because Little had aided and abetted Richards in the commission of the crime, the court held he could be convicted of violating section 424, subdivision 1.

Similarly, here, although petitioner was not a city official, there is evidence that would support a reasonable inference that he aided and abetted other city officials in the misappropriation of city funds. Gene Klatt, city engineer for the City of Porterville, testified that he was first contacted about the Morton Avenue project by either petitioner or Mr. Huffaker, the city manager of Porterville. Petitioner had apparently developed a plan whereby city moneys would be used to improve county property. Mr. Klatt was aware of and subsequently met with petitioner several times to discuss the plans for the Morton Avenue project.

Mr. Klatt prepared the agenda item regarding the project that was presented to the city council and approved on August 12, 1984. The city contribution, which was $23,250, was designated for "the construction of Morton Avenue on the south side, between the curb return and approximately Sunrise Market." The agenda item indicated that five properties were involved and included estimated costs which had been provided by petitioner.

When asked why the agenda item did not indicate that the funds would be used for county purposes, Mr. Klatt testified: "To the best of my recollection, the city would not have expended city funds in a county area for either improvement or acquisition of right of way. The city council, to the best of my knowledge, was aware of the fact that a proposal had been put forth by Mr. Webb that for a payment of twenty-three thousand two hundred fifty dollars, which is the city share, the south side of Morton would be improved, and the city would have either fee title or use existing county easement title for that roadway.

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q.    . . . Are you telling us that the city could not use city money to improve county roadway, is that it?

"A.    They could have, but that was not their normal policy to do so.

"Q. But are you telling us that in approving this agenda item, this twenty-three thousand dollars was going to be used to improve county roadway despite the fact that it was city money?

"A. The payment of the twenty-three thousand dollars could be shown to be cost effective over five parcels. The agreement, if you will, or the proposal, which would perhaps be a better term, was for that amount of money the street would be completed. Which would encompass greater than the five parcels. But that the amount of money was reasonable if you considered cost of acquisition of property; it was also reasonable if you considered no acquisition costs, and just straight improvement costs."

When asked how the plan was to be implemented, Klatt testified: ". . . He [petitioner] would personally meet with the property owners along the street, explain to them what his proposal was, that the city would release money to the property owners, who would, in turn, give it back to Mr. Webb. Mr. Webb would secure the contractors and hire the individuals required to do the work. Mr. Webb would also contact the county for the pave-out, if that was what was required.

"Q. Was there any indication that Mr. Webb was going to ask the property owners to contribute any excess monies, that might have been over and above the cost of improvements in front of their properties, to the balance of the Morton Avenue project?

"A. I have no specific knowledge of what Mr. Webb related to the property owners.

"Q. Well, I'm talking about the plan. I know you don't know that. Was there any plan in that regard?

"A. The entire twenty-three two fifty would come back to the contractors through Mr. Webb for the rest of the improvements.

"Q. Would that be through the process of informing the property owners that the improvement cost offset the right-of-way cost?

"A. I would assume so, yes."

Under cross-examination Mr. Klatt was asked:

"Q. Now, in your experience as an engineer for the city, if this was a city project, and the city was doing the project, would this project have cost more if private contractors were not used?

"A.   Typically,  yes.

"Q.   And to what degree? Can you give some percentage of how much percentagewise  this  might  be  more?

"A.   Between  fifteen  and  thirty  percent  more.

"Q.   So,  by  using  private  contractors,  as  Mr.  Webb  suggested,  having private  individuals,  there  was  going  to  be  a  considerable  savings  to  this project?

"A.   Yes."

Klatt  was  further  asked  on  cross-examination:

"And the twenty-three thousand two hundred fifty dollars that was paid by the city, it was—was it your understanding, and Mr. Huffaker's understanding, that these funds would be turned over to Mr. Webb and Mr. Webb would then deliver those funds to the property owners, who in turn would endorse those funds back to him for payment to Mr. Rodriguez?

"A.   Yes.  Mr.  Rodriguez  was  one  of  the  contractors.

"Q.   And  that  was  the—was  that  the  plan  from  the  very  instance?

"A.   Yes."

And  further,

"Q.   Was there any intent, as far as you're concerned, by the city to pay these people, these five property owners, this twenty-three thousand two hundred fifty dollars for their own use, without the rest of the people on the south  side  of  the  street  being  considered?

"A.   The city was not going to deal directly with any of the property owners, or make any promises to any of the property owners. The money was  being  delivered  to  Mr.  Webb  to  secure  the  improvements.

"Q.   On  the  entire  south  side?

"A.   Yes.

"Q.   *And if Mr. Webb had only improved those five parcels of the parties that the checks were made out to, that would not have been in accord with the agreement,  is  that  correct?*

"A. *That is correct.*" (Italics added.)

Mr. Klatt was questioned also about whether other city officials or city council members were aware that the funds approved would also be used for county purposes. He testified: "Q. Did you personally make Mr. Huffaker aware that there would be any use for this money other than what is proposed here in the agenda item?

"A. Yes.

"Q. Was anyone else present when you did that?

"A. To my recollection, the entire city staff, at the Monday morning staff meeting. Which would have been Mr. William McGuire, Director of Community and Financial Services, Dick Mock[,] Director of Parks, Dan Prizznick, Field Services Coordinator, Jerry Mainord, the fire chief, Mr. Smith, the police chief at that time. Planning director, which would have been Dan Whatley. There may have been others, but I can't remember the names right at the moment.

"Q. Okay. So all of these people you've told us about were made aware by you at the Monday meeting that *this money was going to be used for other than what was contemplated here,* is that what you're telling us?

"A. They were told what the money was for, yes. The item was discussed.

"Q. Okay. What were they told the money was for?

"A. For the completion of street improvements along the south side of Morton from approximately Patsy to the Sunrise Market.

"Q. Now, did that area you've referred to include more than the five property owners that you've referred to in this document, this agenda document?

"A. Yes." (Italics added.)

Based on the foregoing, I conclude that the evidence was sufficient to support a reasonable inference that petitioner aided and abetted other city officials in the misappropriation of city funds. The above cited evidence indicates that petitioner, aware that county funds were not available, hatched a scheme whereby city moneys would be used to improve county property. He apparently presented this plan to both Mr. Huffaker and Mr.

Klatt. Mr. Klatt was aware when he prepared the agenda item that the funds were intended to be used for improvements on properties not listed on the agenda item. His stated purpose for not disclosing this to the city council was that "the city would not have expended city funds in a county area for either improvement or acquisition of right of way." Although Mr. Klatt was aware that the funds were to be used for other than the improvement of city property, he seeks to justify this on the grounds of cost efficiency: the entire street could be improved for what it would have cost to improve the five city properties. In essence, the plan and the justification are as aged and infirm now as they have always been—the end does not justify the means.

Moreover, there is ample evidence that petitioner was not only aware that the purpose for which he used the funds was not the purpose intended by the city council, but with full knowledge initiated the actions of Mr. Klatt. (*People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318].) First, there is evidence that petitioner actually developed the plan whereby city funds would be used to improve county property. He met several times with Mr. Klatt to discuss the plan to use city funds for county improvements. Additionally, petitioner made misrepresentations to the property owners as to the use of the moneys he collected from them. A reasonable inference that can be drawn from petitioner's attempt to conceal the real use for the money is that he knew the city council had not authorized his intended use.

As the majority notes, the preliminary hearing transcripts suggest that petitioner was "the instigator and the dominant figure in the plan whereby moneys belonging to the City were misappropriated." Although petitioner might have been the "dominant figure" he apparently did not act alone in the effort to misappropriate city funds. The evidence at the preliminary hearing suggests that at least Mr. Klatt (and perhaps other city officers) was aware that city funds were to be used to improve county property and that the issuance of the checks to the five city property owners was simply a means of having the disbursement from the city appear to be a legitimate city expense. In fact, it was not the intention of petitioner or Mr. Klatt that the property owners be compensated for anything, but rather the plan was merely a subterfuge by which city money was used to improve county property.

Because the evidence indicates that at least one city official charged with the responsibility for city funds was involved in the plan to misappropriate city funds along with petitioner, I conclude that petitioner could be held for a violation of section 424, subdivision 1, on the theory that he aided and abetted or conspired with city officials to misappropriate city funds.

However, I respectfully dissent from the majority's holding that the "unusual circumstances" surrounding the purchase of the South Main Street property constitute a violation of section 424, subdivision 1.

In order to establish a violation of section 424, subdivision 1, it must be demonstrated that a public official or "other person" charged with responsibility for public funds, misappropriated the funds to his personal benefit or the benefit of others. This section applies not only where the officer or other person has possession of public funds, but also where he has the duty of controlling public funds. (*People* v. *Qui Mei Lee* (1975) 48 Cal.App.3d 516, 523 [122 Cal.Rptr. 43].)

In the present case, the majority concludes that because petitioner caused Ruddock to ask $50,000 for the property he somehow acquired control of county funds and subsequently misappropriated them. Unquestionably, the Board was fully aware of the $50,000 price of the property and of the size of the parcel. Evidently, the focus of the majority's scrutiny is in the Board's lack of awareness that the price had been raised at petitioner's instigation. It is clear, however, that the money appropriated for the property in issue was, in fact, paid for title to that property. In no sense was the money spent for any purpose other than that which was authorized by the Board. That, after payment, the money ultimately may have been put to a purpose the Board was not aware of is, appropriately, a matter of concern; however, I fail to see how petitioner's conduct constituted a violation of section 424. Although the transaction ultimately inured indirectly to his benefit or profit, I do not agree that by causing Ruddock to ask $50,000 for the property which could have otherwise been purchased for $45,000 he acquired control of "the extra $4,351.91 of County funds. . . ."

The majority apparently is concerned that petitioner's conduct resulted in his indirectly receiving a benefit or profit from the transaction. Although petitioner did exercise control of the additional moneys when he received them on release from escrow, at that time they had ceased to be county funds and constituted a profit from the sale. Because petitioner did not exercise control of county funds to his benefit, I cannot agree that there was probable cause to believe petitioner violated section 424, subdivision 1.

That is not to say, however, that petitioner's conduct is not chargeable as a criminal offense. Government Code section 1090 provides in relevant part that county officers "shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." Willful violation of this statute "is punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the state prison, and is forever disqualified from holding any office in this state."

(Gov. Code, § 1097.) "The purpose of the prohibition [in Government Code section 1097] is to prevent a situation where a public official would stand to gain or lose something with respect to the making of a contract over which in his official capacity he could exercise some influence." (*People* v. *Vallerga* (1977) 67 Cal.App.3d 847, 868, fn. 5 [136 Cal.Rptr. 429].)

"A public officer may not make an unauthorized profit out of the particular public business which has been entrusted to his care." (*Terry* v. *Bender* (1956) 143 Cal.App.2d 198, 211 [300 P.2d 119].)

"The public officer's interest need not be a direct one, since the purpose of the statutes is also to remove all indirect influence of an interested officer as well as to discourage deliberate dishonesty. . . .

" '. . . He has an interest the moment he places himself in a situation "where his personal interest will conflict with the faithful performance of his duty as trustee." [Citations.]' " (*Id.* at pp. 206-207.)

In the present case, petitioner apparently induced Ruddock to ask $50,000 for the property which he would have been willing to sell to the County for $45,000. Petitioner's purpose was to create a profit from the sale in order to cover his costs for the expenses incurred in the lot split and the original purchase. In so doing, petitioner acquired a financial interest in the sales contract between Ruddock and the County. Because petitioner had a financial interest in the contract, he arguably violated Government Code section 1090. I cannot indulge in the attempt to convert what is logically a conflict of interest into a violation of section 424 simply because that is the allegation lodged.

I conclude with the reminder that this is a government by the people and for the people. The people, therefore, have a right to know what government does. To serve this end, the business of government is conducted in the light of day and not in the shadows. Not only is scrutiny by the public not a bad thing, it is the duty of public officials not to circumvent that public review.

Petitioner's application for review by the Supreme Court was denied September 15, 1988.